HOPPER, Appellant, v. CITY OF MADISON, and others, Respondents.

*No. 75–143. Argued May 31, 1977.—Decided July 1, 1977.*
(Also reported in 256 N. W. 2d 139.)

124

For the appellant there was a brief by *Alfred S. Regnery* and *Stroud, Stroud, Willink, Thompson & Howard,* and oral argument by *Mr. Regnery,* all of Madison.

For the respondents the cause was argued by *Robert E. Olsen,* assistant city attorney, with whom on the brief was *Henry A. Gempeler,* city attorney.

HANLEY, J. Three issues are presented on appeal:

1. Does the appropriation for services to be provided by the Madison Tenant Union constitute the expenditure of public funds for other than a public purpose?

2. Does the appropriation for services to be provided by the Spanish-American Organization constitute the expenditure of public funds for other than a public purpose?

3. Does the appropriation to the public health department for a day care program constitute the expenditure of public funds for other than a public purpose?

In considering the above issues, inquiry must be made in relation to the general rules of the public purpose doctrine applicable to each challenged appropriation and to

the nature and sufficiency of the affidavits filed by the appellant in support of her motion for summary judgment.

*The Public Purpose Doctrine*

Although not established by any specific clause in the state constitution, the public purpose doctrine is a well-established constitutional tenet. *State ex rel. Warren v. Nusbaum,* 59 Wis.2d 391, 413–14, 208 N.W.2d 780 (1973); *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis.2d 32, 47–48, 205 N.W.2d 784 (1973). "Public funds may be expended for only public purposes. An expenditure of public funds for other than a public purpose would be abhorrent to the constitution of Wisconsin." *Nusbaum, supra* at 414.

This rule applies to the expenditure of public funds by municipalities. *Hammermill, supra; David Jeffrey Co. v. City of Milwaukee,* 267 Wis. 559, 587, 66 N.W.2d 362 (1954).

What constitutes public purpose is in the first instance a question for the legislature to determine and its opinion should be given great weight. *Nusbaum, supra* at 414. This court, however, is not bound by the legislature's enactment or declarations regarding its purpose, for it is the court's constitutional burden to examine the challenged legislation and assess its realistic operation. *Hammermill, supra* at 50–51; *Nusbaum, supra* at 418.

In so examining a legislative expenditure of public funds, there is a strong presumption that a legislature's acts are constitutional, and it is the duty of this court, if possible, to construe a legislative enactment as to find it in harmony with constitutional principles. *Hammermill, supra* at 46–47; *Gottlieb v. Milwaukee,* 33 Wis.2d 408, 415, 147 N.W.2d 633 (1967). In *Hammermill* the court stated at page 46:

"It is not enough that respondent establish doubt as to the act's constitutionality nor is it sufficient that respondent establish the unconstitutionality of the act as a probability. Unconstitutionality of the act must be demonstrated beyond a reasonable doubt. Every presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality."

The court is not concerned with the wisdom, merits or practicability of the legislature's enactment, but only with its validity in light of specific constitutional principles. *Wisconsin Solid Waste Recycling Authority v. Earl,* 70 Wis.2d 464, 478, 235 N.W.2d 648 (1975) ; *Nusbaum, supra* at 413.

It is constitutionally sufficient if any public purpose can be conceived which might reasonably be deemed to justify or serve as a basis for the expenditure. *Nusbaum, supra* at 414. "A court can conclude that no public purpose exists only if it is 'clear and palpable' that there can be no benefit to the public." *Hammermill, supra* at 56; *West Allis v. Milwaukee County,* 39 Wis.2d 356, 377, 159 N.W.2d 36 (1968).

To sustain a public purpose, the benefit to the public must be direct and not merely indirect or remote. *Wisconsin Development Authority v. Dammann,* 228 Wis. 147, 180, 277 N.W. 278, 280 N.W. 698 (1938). However, the fact the appropriation is made to a private agency does not render it unconstitutional. If an appropriation is designed in its principle parts to promote a public purpose so that its accomplishment is a reasonable probability, private benefits which are necessary and reasonable to the main purpose are permissible.

For the public purpose requirement to be met, the subject matter of the appropriation must be of public

necessity, convenience or welfare. *Wisconsin Development Authority, supra* at 182, quoting *Laughlin v. City of Portland,* 111 Me. 486, 499, 90 A. 318 (1914); *Nusbaum, supra* at 419. "Each case must be decided with reference to the object sought to be accomplished and to the degree and manner in which that object affects the public welfare." 15 McQuillin, *Municipal Corporations* §39.19, at 32 (3rd ed. 1970). Factors which may be considered include the course or usage of the government, the objects for which taxes have been customarily levied, the objects which have been considered necessary for the support and proper use of government, the extent to which the expenditure results in competition with private enterprise, the presence or absence of a general economic benefit, the number of citizens benefited, and the necessity and infeasibility of private performance.

*Affidavits Filed by Appellant*

At the trial level the respondents challenged the appellant's supporting affidavits as containing materials which may not properly be considered upon a motion for summary judgment. Affidavits in support of a motion for summary judgment must contain evidentiary facts, of which the affiant has personal knowledge. *Kroske v. Anaconda American Brass Co.,* 70 Wis.2d 632, 641, 235 N.W.2d 283 (1975); sec. 270.635(2), Stats. (1973). Portions of affidavits which are made by persons who do not have personal knowledge or which contain allegations of ultimate facts, conclusions of law or anything other than evidentiary facts do not meet the statutory requirements and will be disregarded. *Kroske, supra; Walter Kassuba, Inc. v. Bauch,* 38 Wis.2d 648, 652, 158 N.W.2d 387 (1968).

In support of her motion for summary judgment the appellant filed her own affidavit, the affidavit of Cath-

erine Bricker, the owner and operator of Madison Child Care Center, and the affidavit of Alfred S. Regnery, counsel for the appellant. The respondents challenge the sufficiency of the content of each of these affidavits, and they will be considered seriatim.

The affidavit of the appellant, Victoria Hopper, contains nine numbered paragraphs, the first two of which formally state that she is the plaintiff in the action and a resident taxpayer of Madison. The third paragraph states the fact the challenged appropriations were made by the city. The remaining paragraphs, numbered four through nine, each relate to a particular appropriation. None of these remaining paragraphs contain statements of evidentiary facts which are within the affiant's own knowledge. These paragraphs consist solely of recitation of the complaint and statements of ultimate fact and conclusions of law. We conclude, therefore, that these statements in the affidavit of Victoria Hopper fail to meet the statutory requirements and may not support her motion for summary judgment.

The affidavit of Catherine Bricker, the owner and operator of Madison Child Care Center, contains one allegation, in paragraph six, which is made upon information and belief. This kind of allegation is not proper in support of a motion for summary judgment and is ineffectual to establish evidentiary facts.

The affidavit of appellant's counsel, Alfred S. Regnery, generally does not consist of evidentiary fact within his personal knowledge, but rather is substantially Attorney Regnery's summary of evidence and his conclusions thereon. The major portion of Attorney Regnery's affidavit includes matters outside his personal knowledge and nonevidentiary facts which may not be considered in support of a motion for summary judgment.

*Appropriation for Services of Madison Tenant Union*

The city council appropriated $10,000 to the budget of the City Planning Department to be granted to MTU in exchange for services to be performed pursuant to the terms of a written agreement between the city and MTU. Under this contract, MTU is obligated to "perform services for the City as outlined in the attached Human Resources Funding Application Form and any amendments thereto." MTU's application form describes the service to be provided generally as an information and grievance service for tenants, designed to inform tenants of their rights and assist them with problems in the landlord-tenant relationship. This service will be provided by grievance workers who will answer telephone inquiries and meet with individual tenants. These workers will be familiar with the applicable statutory law and the entire situation of tenants in Madison.

In addition to the claim that the MTU appropriation is generally for other than a public purpose, the appellant specifically charges that the services to be provided by MTU under the contract will constitute the unlawful practice of law, contrary to sec. 256.30, Stats. Under this section, the unauthorized practice of law is a misdemeanor. Certainly, the expenditure of public funds for an unlawful activity is an expenditure for other than a public purpose.

The charge of illegal practice of law focuses upon two aspects of the service. First, the appellant directs attention to a statement in MTU's application for funding that the grievance workers will on occasion accompany tenants to pre-trial hearings at small claims court. However, an amendment attached to the contract between the city and MTU expressly provides: "It is agreed that the services to be performed under this contract will not include accompanying persons to Small Claims Court. . . ."

The second aspect to the MTU service attacked as the illegal practice of law is the providing of information as to the legal rights of tenants. This court has held that the giving of advice as to legal rights and obligations constitutes the practice of law. *State ex rel. State Bar of Wisconsin v. Keller*, 16 Wis.2d 377, 388–89, 114 N.W.2d 796 (1962).

The trial court concluded that:

". . . [t]he primary concerns and activities of the Tenants Union center around landlord-tenant relations, the rights and interests of tenants, the planning of rental transactions so as to minimize later disputes, and dispute settlement. Any additional informational services to tenants can be reasonably construed to be incidental to the usual or ordinary course of business of the Tenants Union and offered in a non-legal capacity."

Under sec. 256.30(2), Stats., legal advice which is incidental to a person's usual or ordinary business does not fall within the definition of practicing law.

We think that to forbid MTU's informational service as the illegal practice of law would infringe upon First Amendment rights recognized by the United States Supreme Court in *United Transportation Union v. State Bar of Michigan*, 401 U.S. 576 (1971); *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217 (1967); and *Brotherhood of Railroad Trainmen v. Virginia State Bar*, 377 U.S. 1 (1964). These cases uphold the principle that the First Amendment guarantees of free speech, petition and assembly protect the right of persons to unite to assert their legal rights as effectively and economically as possible. *United Transportation Union, supra* at 580.

The primary purpose of the laws controlling the unauthorized practice of law is "to assure that the public

is not put upon or damaged by inadequate or unethical representation." *Littleton v. Langlois*, 37 Wis.2d 360, 364, 155 N.W.2d 150 (1967). The appellant concedes that most questions of landlord-tenant law are probably simple. However, she argues that some questions in this are complex and should not be the subject of the advice of non-lawyers. However, nothing in the record indicates that MTU's service will provide inadequate or unethical advice. The record does not show that MTU's grievance handlers will give advice as to legal rights in all situations, as opposed to only giving such advice under simple circumstances and, where more than a simple reference to a statute is required, advising the inquirer to seek legal counsel. We note from MTU's application for funding that organizations that have contacted or referred people to MTU include: Wisconsin Indian Legal Services, Dane County Legal Services and Community Law Office. Certainly these organizations would not be referring complex legal questions to MTU.

On the basis of this record, we conclude that MTU information service is protected by First Amendment guarantees. The appellant has failed to carry her burden of proof that this service is not so protected and thus illegal beyond a reasonable doubt.

The appellant also contends this appropriation lacks a public purpose generally. In support of this position, the appellant argues that only that part of the city comprised of tenants could benefit from the services purchased from MTU. Although the number of beneficiaries is a pertinent factor in determining whether an appropriation has a public purpose, this court has stated many times "the fact the [appropriation] may benefit certain individuals or one particular class of people, more immediately than other individuals or classes does not necessarily deprive the [appropriation] of its public purpose." *Nus-*

*baum, supra* at 418; *Wisconsin Development Authority, supra* at 178.

The appellant also makes the argument that the trial court, in concluding the MTU appropriation was for a public purpose, only considered the grievance operation in the most favorable light and failed to consider what MTU would in fact do with the appropriation. The appellant claims evidence of certain MTU activities demonstrates that MTU is not concerned with promoting peaceful and equitable landlord-tenant relations, the adherence to local and state laws controlling these relations, or understanding by tenants of the rights and problems of landlords. The evidence referred to, appellant claims, shows that MTU's only interest is in furthering tenants' rights against those of landlords in any possible manner, including the promotion of rent strikes, picketing, boycotts, and blacklisting of selected landlords. Appellant argues that there is no reason to believe that the Tenant Union would act any differently in the future, simply because it is being subsidized by the city, than it has in the past.

However, the appropriated funds may be used only as provided in the contract between the city and MTU. This contract does not include any of the above-mentioned activities.

This appropriation to MTU is adequately attended by procedures insuring control and accountability to secure the public interest. The quarterly payments to MTU will be conditioned upon the filing by MTU of detailed reports of the receipts and expenditure of the public money. MTU will be required also to file quarterly program reports stating the services furnished through the use of the city's appropriation. Numerous financial recording requirements are also imposed upon MTU by the contract.

The record shows that of all housing units in the city, 49.3 percent are occupied by tenants. MTU's application for funding states that MTU receives approximately 75 telephone calls concerning landlord-tenant problems each week. A community with such a significant tenant segment has an interest in equitable landlord-tenant relations. These relations are a matter of public welfare. The expenditure for informational and grievance services for tenants who lack the expertise held by landlords in landlord-tenant law promotes such equitable relations. This program will also promote adherence to local and state laws governing landlord-tenant relations. Upon this record, it is not clear and palpable that there can be no benefit to the public by this expenditure. It has not been established beyond a reasonable doubt that no public purpose can be conceived which might reasonably justify this expenditure. It is not, therefore, unconstitutional.

## Appropriation to Spanish-American Organization

The city appropriated $14,000 to SAO for its program, a bilingual multi-service center. SAO's application, which outlines the services purchased under SAO's contract with the city, states that SAO will provide:

"[1] bi-lingual outreach and referral services to Spanish-speaking residents of Madison and Spanish-speaking migratory farm workers;

"[2] employment and educational counseling for migrant workers in the transitional process of resettlement;

"[3] in cooperation with the Area Technical College, courses in adult basic education and English as a second language;

"[4] temporary accommodations for migrant families in the process of resettlement and assistance in locating adequate permanent housing; [and]

"[5] in cooperation with the Wisconsin State Employment Service, bi-lingual job counseling, development and placement services to Spanish-speaking residents."

The appellant's first challenge to the SAO appropriation is that the services purchased by the city from SAO are limited to beneficiaries of Spanish-American descent, and therefore the appropriation is discriminatory. Although the legal conclusion that the challenged appropriations would cause a denial of due process and equal protection was asserted in the complaint, the appellant failed to raise the issue before the trial court. It is the practice of this court not to consider issues raised for the first time on appeal since the trial court has had no opportunity to pass upon them. *Terpstra v. Soiltest, Inc.,* 63 Wis.2d 585, 593, 218 N.W.2d 129 (1974). Whether the court will in its discretion consider such an issue depends upon the facts and circumstances of each case. Here the record and arguments in the briefs do not justify the exercise of the court's discretion to consider this issue. It is sufficient to note that the services to be provided by SAO are not limited to persons of Spanish-American descent. The record shows that the services offered under the contract are offered to any persons who have a language barrier because their primary language is Spanish. This does not constitute discrimination on the basis of race or ethnic background.

The appellant further claims that the SAO expenditure generally lacks a public purpose because only a small number of persons will benefit and because some of the persons served will be migrant workers who are not residents of the city. As stated above in respect to the MTU appropriation, the fact a certain group of persons are the immediate beneficiaries of the appropriation does not necessarily deprive the appropriation of its public purpose.

In its application for funding, SAO stated:

"The 1970 U. S. Census indicates that there are over 2,200 residents in Dane County whose principle language

is Spanish. The area Spanish-speaking community is one of the fastest growing sub-communities in the State of Wisconsin and in Madison. With the gradual decline of the migrant labor market, many former migrant families, a majority of who are Chicano, have chosen to resettle in Wisconsin. Although the greater share of resettlement has taken place in the State's south-eastern counties, Madison continues to receive an additional 10 to 20 families each year. 1973–74 public school enrollment data shows that the Spanish-speaking community of Madison is the 5th largest in the State. In addition, nearby food processing plants annually attract several hundred Spanish-speaking migratory workers who travel through Madison on their way to other jobs or in the resettlement process."

At his adverse examination, Humberto Garcia, coordinator of SAO, discussed the social and economic problems of the persons in the Spanish-speaking community. A significant number of these persons have very little education, approximately three and one-half years on the average, and must rely on government welfare programs for financial support. Their language and cultural differences are barriers to communication which is necessary to obtain employment, education, and necessities such as medical assistance. Garcia stated that on numerous occasions Spanish-speaking migrants, often with children, are stranded in the city with no shelter or financial means. The services to be provided under the contract between SAO and the city seek to assist these persons in solving their various problems caused in large part by their language barrier.

A community center which provides such assistance serves a public purpose. In the absence of such services, the public may be harmed by the recognized social consequences of poverty and illiteracy. It is a reasonable conclusion that these services will enable Spanish-speaking persons to contribute economically and culturally to

the community. These matters are within the objective of the public welfare, the promotion of which will benefit the community as a whole.

In regard to the services provided by SAO to persons in the migrant stream, the citizenry receives the benefit of satisfaction from fulfilling a perceived moral duty by providing temporary assistance to these shelterless, needy persons. Such temporary accommodations also avoid the problem of these persons having nowhere but the streets to go. These benefits are certainly not as significant as those received by the public when the persons receiving the service are residents of the city, and it would be difficult to find a constitutionally sufficient public purpose served by an expenditure for service only for migrants. However, in this case, services provided to migrant workers are only a portion, the record shows, of all the services to be provided by SAO under its program. The SAO program, as a whole, promotes a public purpose, and therefore the expenditure to purchase services provided by that program is constitutional.

*Appropriation for Day Care*

The city appropriated a total of $198,000 to the budget of the City Department of Public Health for various day care services. $117,000 of this money was designated as tuition aids to be distributed based upon standards of family need. These standards had not been established by the city council at the time of the commencement of the action, and the trial court therefore granted summary judgment to the defendant in respect to this portion of the appropriation for the reason that it could not be determined what persons would be served by the funds. The appellant does not challenge the trial court's decision in respect to this $117,000 appropriation for a day care tuition aids program.

The appellant does claim, however, that the trial court erred in not finding the appropriation of the remaining approximately $81,000 to be for other than a public purpose. Generally stated, these funds are to be allocated for two operations: (1) administration of the city's day care program, which includes salaries and benefits for city employees overseeing the program, and (2) direct aid to day care centers to improve their quality.

The appellant argues that this day care appropriation is for educational purposes and is therefore unlawful because a municipality has no authority to spend funds for education outside of the city school system. This issue was not raised or argued before the trial court, and therefore the court will not consider it.

The appellant's major challenge to this expenditure for day care is that it lacks a public purpose because it is not to be limited for the benefit of poor and needy families, and therefore will aid families who do not need assistance. The appellant relies upon the case of *Ferrie v. Sweeney,* 34 Ohio 272, 72 N.E.2d 128 (1946). In *Ferrie* the city of Cleveland appropriated funds to maintain day care centers, which had been established during the world war and which had during that time been financed by the federal government. These centers were open to any family, regardless of need, for the nominal fee of 75¢ per day per child. The Ohio court held that the bestowal of care at public expense on children of those whose financial condition did not require it was improper as an expenditure of public funds for a private purpose.

The instant case is distinguishable from *Ferrie,* because the expenditures are of a different nature. In *Ferrie* the municipality, by its appropriation, did not seek to simply aid the centers, but undertook their maintenance and operation. Virtually the entire cost, except for the nominal fee, was to be borne by the city.

In the instant case, a portion of the challenged expenditure is to be used for the administration of the city's

entire day care program. A significant portion of this expense will undoubtedly go to the administration of the tuition aids program for needy families. Standards are to be set to determine whether families qualify for tuition aid, and day care centers will also be required to meet standards before they may accept tuition aid payments. Such a program requires supervision to be sure standards are met. The other portion of the challenged expenditure in this case, the direct aid to day care centers, also relates to the tuition aid program. Although these various direct aids are available to all centers certified for the tuition aid program, they are also available to non-qualifying centers for the purpose of enabling them to improve their operations and meet the standards for certification. Furthermore, direct tuition aid to qualifying centers is only for the purpose of improving their quality, not to finance their existence. Under the day care center program financially capable families must pay their own tuition, not just a nominal fee. Thus, *Ferrie* is distinguishable on the basis of the nature of the expenditures.

The city's expenditure to ensure the availability of quality day care benefits the community as a whole. The record reasonably supports the conclusion that there is a need for improved day care service. The report of the City Committee on Day Care shows that in the city over 35 percent of women with children under the age of six are in the labor force. The report further states that less than half the children under the age of six who require out of home care may be accommodated in the presently available facilities. The vast majority of children in grades kindergarten through fifth who need extended care are not provided for. The two aspects of the day care program which are challenged here are to a great degree intertwined with the tuition aids program, which provides relief to poor and needy families, enabling the parents to work and contribute economically to the city.

It may not be seriously questioned that the care and supervision of the city's children is a matter of public health and welfare. It is reasonable to conclude that the city's program to improve and make more available day care service promotes these objectives. The appellant's claim that present day care facilities are adequate goes to the wisdom of the legislation, not whether it serves a public purpose.

We conclude that the challenged appropriations were not made contrary to the law. They constituted expenditure of funds for public purposes by promoting the health and general welfare of the public. The trial court correctly granted the defendants' motion for summary judgment dismissing the plaintiff's action.

*By the Court.*—Order affirmed.