LAURENCE LEWIS, Chairman Mining Investment and Local Impact Fund Board
You ask whether the Mining Investment and Local Impact Fund Board (here in after "Board") may make grants under sec. 70.395, Stats., to municipalities for mining-related costs incurred by private landowners. Two specific factual situations are cited in your request. The first situation involves the costs incurred by farmers to drill new *Page 49 
wells where the existing wells have been contaminated as the result of nearby mine closings. The second fact situation involves costs incurred to "fence in" abandoned mine shaft cave-ins on private property to protect individuals who may wander onto the land.
Your concern is whether the Board is statutorily authorized to make such grants. My answer is "yes." You also ask whether such grants would be constitutional in terms of the "internal improvements" clause, Wis. Const. art. VIII, sec. 10 and the public purpose doctrine. My answer is "yes."
Chapter 353, Laws of 1979, effective May 22, 1980, makes state funds available expressly to cover the types of mining-related costs with which you are concerned. However, the new law applies only to mining activities occurring subsequent to the act's effective date. Since the mining activities you describe ceased prior to the effective date of ch. 353, Laws of 1979, those funds are not available for the costs cited in your question.
There is no such time limitation relative to grants made out of the investment and local impact fund (hereinafter "fund"), however. Rather, the Legislature, in creating the fund, expressed its intent as follows:
 It is the intent of the legislature that the investment and local impact fund be used exclusively to provide funds to municipalities for costs associated with social, educational, environmental and economic impacts of metalliferous mineral mining incurred prior to, during and after the extraction of metalliferous minerals, including the impacts of metalliferous mineral mining occurring prior to July 7, 1977. The fund may not be used to compensate counties, towns, cities and villages for the costs of mine reclamation for which the person mining the metalliferous minerals is liable under s. 144.91 (2)
Sec. 70.395 (2) (a), Stats. Grants may, therefore, be made out of the fund for mining-related impacts, regardless of the date of cessation of mining activities. *Page 50 
The purposes for which the fund may be used are specified in sec. 70.395 (2)(g), Stats., which reads in part:
 The board may distribute the revenues received under sub. (1)(b) or proceeds thereof in accordance with par. (h) for the following purposes, as the board determines necessary:
. . . .
 10. Expenses attributable to a permanent or temporary closing of a mine including the cost of providing retraining and other educational programs designed to assist displaced workers in finding new employment opportunities and the cost of operating any job placement referral programs connected with the curtailment of mining operations in any area of this state.
Thus, the Board is vested with broad statutory discretion to make grants to municipalities to remedy the adverse impacts of mine closings. Nevertheless, sec. 70.395 (2)(g), Stats., places two conditions on exercise of the Board's discretion. First, the Board must find that the expenses are attributable to the mine closings. Second, the Board must determine that a grant for a particular purpose is necessary. To illustrate the operation of the "necessity" determination, one could hypothesize a mine shaft cave-in that would be located so remotely or be so obvious to passers-by that the Board would be incapable of making a determination of necessity relative to the fencing of the cave-in.
Subject to the requirements that the Board determine the necessity of the grant and make a finding that the expenses are attributable to the mine closings, it is my opinion that the Board has statutory authority to make grants to municipalities for the purposes you have described.
There is precedent for such authority. AS discussed above, ch. 353, Laws of 1979, expressly created a mechanism to provide state funds for mining-related property damage. Also, the Board's grants to municipalities for well-drilling would be quite similar in purpose and function to the grants for private sewage systems provided by sec. 144.24 (10), Stats. *Page 51 
You also ask whether grants under sec. 70.395 (2), Stats., for those purposes would be consistent with the constitutional public purpose doctrine. That state funds may only be spent for a public purpose of statewide concern is a well-established principle of constitutional law. State ex rel. Wisconsin Dev. Authority v.Dammann, 228 Wis. 147, 183, 277 N.W. 278, 280 N.W. 698 (1938). However, an act of the Legislature is entitled to a strong presumption of constitutionality and will not be overturned unless unconstitutionality is established beyond a reasonable doubt. State ex rel. Hammermill Paper Co. v. La Plante,58 Wis.2d 32, 46, 205 N.W.2d 784 (1973). If there is any conceivable public purpose, the statute will be upheld. State ex rel. Warrenv. Nusbaum, 59 Wis.2d 391, 414, 208 N.W.2d 780 (1973).
The Wisconsin Supreme Court has long held that the promotion and protection of public health is a matter of statewide concern.State ex rel. Martin v. Juneau, 238 Wis. 564, 570-71,300 N.W. 187 (1941). The court has determined that protection of the state's water supplies for the use of its citizens promotes public health and is therefore a public purpose. In State ex rel.La Follette v. Reuter, 33 Wis.2d 384, 147 N.W.2d 304 (1967), the court upheld the constitutionality of a statute which provided for state financial assistance to municipalities for the construction of water pollution abatement facilities, stating that the "primary reason in constructing pollution abatement facilities is to protect the health of all citizens of the state whose need for pure water is essential to life itself." La Follette,33 Wis.2d at 397.
Similarly, the primary reason for well-drilling grants would be to assure a pure water supply to the municipality's citizens. The fact that a particular grant could be made to a sparsely-populated locality, where a relatively few citizens would directly benefit, does not affect the public purpose of the statute. As stated by the supreme court in State ex rel. Thomsonv. Giessel, 265 Wis. 207, 216, 60 N.W.2d 763 (1953):
 "The existence of local conditions which, because of their nature and extent, are of concern to the public as a whole, the modes of advancing the public interest
by correcting them or avoiding their consequences, are peculiarly within the knowledge *Page 52 of the legislature, and to it, and not to the courts, is committed the duty and responsibility of making choice of the possible methods."
(Emphasis the court's.)
It is my opinion that grants to municipalities under sec.70.395 (2), Stats., to drill new wells for citizens whose existing wells have been contaminated by mine closings serve a public purpose.
Grants for the fencing of mine cave-ins would appear to have public safety as their primary objective. And as I have stated in an earlier opinion, "I know of no more universally recognized function of government at any level than the protection of public safety." 57 Op. Att'y Gen. 228, 230 (1968).
The Legislature, in recently enacting ch. 353, Laws of 1979, recognized dangers to persons and property occasioned by mine cave-ins, and further recognized the need for a state-funded mechanism to compensate individuals suffering personal or property injuries (see the prefatory note to the act, which details the obstacles to recovery for mining-related damages). It logically follows that if the Legislature has recognized a public need to compensate individuals for injuries caused by mine cave-ins, there may also reasonably exist a public need for fencing of the cave-ins to prevent those injuries from occurring.
Whether a particular grant promotes public safety is a factual question for the Board to decide. As discussed above, it is the Board's responsibility to determine whether or not a specific grant is "necessary." In terms of the promotion of public safety, a relevant consideration of the Board is the number of persons benefited by a particular grant. See Hopper v. Madison,79 Wis.2d 120, 130, 256 N.W.2d 139 (1977). As noted above, there may be particular cases where, due to location or obviousness, a cave-in simply does not involve public safety.
It is important to note that, in considering questions of public purpose, the fact that the grants benefit private individuals is not controlling. The supreme court has concluded that" [i]f an appropriation is designed in its principle parts to promote a public purpose so that its *Page 53 
accomplishment is a reasonable probability, private benefits which are necessary and reasonable to the main purpose are permissible." Hopper, 79 Wis.2d at 129.
The Legislature's main purpose in creating the fund is to utilize mining tax revenues to provide compensation for the adverse effects of mining activities. Sec. 70.395 (2)(a), Stats. In this case, those adverse effects include the contamination of water supplies and mine shaft cave-ins caused by mine closings. The fact that these problems have now manifested themselves on private land does not abrogate the underlying public scope of the problem and public purpose in providing a remedy for them. The drilling of wells and the fencing of cave-ins on private land would certainly appear to be necessary and reasonable to the main purpose of the fund, i.e., to remedy the public health and safety problems created by past mining activities.
Grants for well-drilling and fencing of cave-ins have, as their primary objective, the promotion and protection of public health and public safety, respectively. Such grants are therefore consistent with the constitutional requirement that state funds be spent only for public purposes.
Finally, you ask whether grants under sec. 70.395 (2), Stats., for well-drilling and fencing of mine cave-ins comply with Wis. Const. art. VIII, sec. 10, which prohibits the state from engaging in "works of internal improvement," which the supreme court has defined as follows:
 "`Works of internal improvement,' as used in the constitution, means, not merely the construction or improvement of channels of trade and commerce, but any kind of public works, except those used by and for the state in performance of its governmental functions, such as a state capitol, state university, penitentiaries, reformatories, asylums, quarantine buildings, and the like, for the purposes of education, the prevention of crime, charity, the preservation of public health, furnishing accommodations for the transaction of public business by state officers, and other like recognized functions of state government." *Page 54 
State ex rel. Owen v. Donald, 160 Wis. 21, 79, 151 N.W. 331
(1915) (quoting from Rippe v. Becker, 56 Minn. 100, 117,57 N.W. 331 (1894)). Thus, state activities concerning the "preservation of public health" and "other like recognized functions of state government," are excluded from the prohibitions of the internal improvements clause.
The supreme court has held that "[i]f a law is predominantly public in its aim, it will not be held to violate the internal improvements provision, in spite of the fact that the state carries on internal improvements incident to the main public purpose of the law." Wisconsin Solid Waste Recycling Auth. v.Earl, 70 Wis.2d 464, 492, 235 N.W.2d 648 (1975). The main public purpose of the grants under sec. 70.395 (2), Stats., as discussed above, is the promotion and protection of public health and safety. Such grants would therefore not violate the internal improvements clause.
BCL:DDS