PAUL L. BROWN, Secretary State Building Commission
You ask whether the State Building Commission may constitutionally issue general obligation bonds to fund the Wisconsin Farmers Fund Program (hereinafter "Program") established in section 92.32, Stats. My answer is yes.
Section 92.15 was created pursuant to 1983 Wisconsin Act 27, section 1364m (renumbered and hereinafter referred to as section 92.32 by 1983 Wisconsin Act 410. section 24K), and the related borrowing authority set forth in section 20.866(2) and (2p) was created pursuant to 1983 Wisconsin Act 27, section 563m (collectively the "Act"). Pursuant to the Act. the Department of Agriculture, Trade and Consumer Protection may make payments from general obligation bond proceeds to counties that participate in the Program, provided that the counties comply with criteria set forth in the Act and further comply with the rules promulgated by the Department. Chapter AG 165 Wis. Adm. Code. The participating counties are then required to distribute these funds to individual owners and/or operators of animal feeding operations (hereinafter "individual") in the form of grants for the development of facilities and structures to treat, store or control runoff of animal waste.
The State Building Commission has never before issued general obligation bonds for this purpose. Since the funds raised by the general obligation bonds could be construed as directly aiding private individuals, you fear that by issuing general obligation bonds as requested, several provisions of Wisconsin Constitution article VIII may be violated. Specifically, your first concern is whether the facilities to be financed under the Program satisfy the "public purpose" test as it has been variously defined. The second area of your concern is whether the facilities built under the Program will satisfy the "governmental function" test exception to the internal improvement prohibition expressed in Wisconsin Constitution article VIII, section 10. Your final concern involves whether the issuance of the general obligation bonds constitutes a giving or lending of state credit "in aid" of individuals, corporations or associations in contravention of Wisconsin Constitution article VIII, section 3. Each area of concern will be separately addressed. *Page 27 
Preliminary to the separate discussion of each concern, I wish to briefly consider your observation that the Act contains no preamble with an explicit statement of legislative purpose. Oftentimes the Legislature will include, as a preamble to an act, the legislative purpose of that act. At other times, however, the Legislature fails to include such a statement of the legislative
purpose. When faced with the latter situation, one may derive thelegislative purpose of an act by either considering the language of the act as a whole or by considering the legislative purpose of related statutes. Nekoosa-Edwards P. Co. v. Public Serv. Comm.,8 Wis.2d 582, 591-92, 99 N.W.2d 821 (1959); McGraw-Edison Co v.ILHR Dept., 72 Wis.2d 99, 105, 240 N.W.2d 148 (1976).
Though not explicitly stated, I believe the legislative purpose of the Act is to reduce water pollution caused by animal waste runoff from farms. First, an examination of the language of the Act supports this conclusion. For example, section 92.32(2)(c)1. limits grants "to animal waste treatment or permanent runoff check control structures or storage facilities which are necessary to meet water quality objectives." Second, the Act comports with the legislative purpose articulated in section 144.025 — "to protect, maintain and improve the quality and management of the waters of the state, ground and surface, public and private." See also, ch. 147, Stats.
Let me now address your specific concerns.
I. Public Purpose Doctrine.
The origin of the Public Purpose Doctrine has been traced to the due process and equal protection clauses of the state and federal constitutions as well as Wisconsin Constitution article VIII, section 2. Eich, A New Look at the Internal Improvementsand Public Purpose Rules, 1970 Wis. L. Rev. 1113, 1115. The Wisconsin Supreme Court, in discussing the several origins of the doctrine, explained that it does have clear constitutional underpinnings: "Although no constitutional provision specifically directs the expenditure of public funds for public purposes only, such limitation is a `well-established constitutional tenet'"Wisconsin Solid Waste Recycling Auth. v. Earl, 70 Wis.2d 464,478, 235 N.W.2d 648 (1975).
Although the doctrine's history is admittedly confused, its present day meaning is quite clear: public funds may be spent only for public purposes. Moreover, where state funds are concerned, the purpose must also be of statewide concern. Stateex rel. La *Page 28 Follette v. Reuter, 33 Wis.2d 384, 397, 147 N.W.2d 304 (1967);State ex rel. Wisconsin Dev. Authority v. Dammann, 228 Wis. 147,183, 277 N.W. 278, 280 N.W.2d 698 (1938).
In determining exactly what constitutes a statewide public purpose, the Wisconsin Supreme Court has forged several important guidelines and presumptions. First, it is a fundamental principle of the doctrine that the Legislature has the power to decide what constitutes a public purpose. State ex rel. Hammermill Paper Co.v. La Plante, 58 Wis.2d 32, 44, 47, 205 N.W.2d 784 (1973); Stateex rel. Warren v. Reuter, 44 Wis.2d 201, 212, 170 N.W.2d 790
(1969); David Jeffrey Co. v. Milwaukee, 267 Wis. 559, 571,66 N.W.2d 362 (1954). In fact, "[i]f any public purpose can be conceived which might rationally be deemed to justify the act or serve as a basis for the instant expenditure, the test is satisfied . . . ." State ex rel. Warren v. Nusbaum,59 Wis.2d 391, 414, 208 N.W.2d 780 (1973). Moreover, every act of the Legislature, including this one, is entitled to a strong presumption of constitutionality and will not be overturned unless the act's unconstitutionality is established beyond a reasonable doubt. Hammermill, 58 Wis.2d at 46.
Unquestionably, the expenditure of funds for the construction of facilities and structures designed to curb water pollution clearly serves a public statewide purpose. See sec. 147.011, Stats. The funds will be used to combat water pollution, which is a concern not only to farmers, but to all citizens of this state. In fact, the supreme court has held that water pollution abatement is a statewide public purpose. La Follette,33 Wis.2d 384. In La Follette, 33 Wis.2d at 396-97, the court, in upholding the constitutionality of a statute which provided state financial assistance to municipalities for the construction of water pollution abatement facilities, stated: "The statewide importance of water pollution abatement in any given locality of the state is obvious since our rivers, streams, lakes and tributaries are not confined by municipal boundaries. The abatement of water pollution is essential to the health and welfare of all of the people of the state." Moreover, the court has long held that the promotion and protection of public health is a matter of statewide concern. La Follette, 33 Wis.2d at 397
(citing State ex rel. Martin v. Juneau, 238 Wis. 564, 570-71,300 N.W. 187 (1941)). Thus, it is clear that the purpose of the Program, which is to collect, store and treat animal waste in order to abate water pollution, constitutes a statewide public purpose *Page 29 
You suggest that because state money will ultimately be channeled to private individuals to construct the facilities and structures, it may be difficult to extrapolate a statewide public purpose. For several reasons, however, this suggestion is unfounded.
First, it is clear that the fact that a grant may incidentally benefit a private individual does not diminish the public nature of the grants. Long ago the supreme court stated that "the fact that an expenditure of public funds benefits certain individuals or one class more immediately than it does other individuals or another class does not necessarily deprive the expenditure of its public character." Dammann, 228 Wis. at 178, 182, 183; State exrel. American Legion 1941 Conv. Corp. v. Smith, 235 Wis. 443,451, 293 N.W. 161 (1940). More recently, the supreme court has concluded that "[i]f an appropriation is designed in its principle parts to promote a public purpose so that its accomplishment is a reasonable probability, private benefits which are necessary and reasonable to the main purpose are permissible." Hopper v. Madison, 79 Wis.2d 120, 129,256 N.W.2d 139 (1977).
The supreme court has also considered this issue of private benefit/public purpose in a most important public purpose doctrine case. In Warren v. Reuter, state funds were budgeted for the operation of what was formerly Marquette Medical School. The state's proposed financing was challenged in part as a violation of the public purpose doctrine. Opponents argued that the appropriation benefited a private school, and therefore constituted a private purpose. The court, in its opinion, recognized that a private purpose would indeed be enhanced. However, the court drew a distinction between incidental private benefit and dominant public purpose:
 This argument confuses the means with the end. An act is constitutional if it is designed in its principal parts to promote a public purpose so that the attainment of the public purpose is a reasonable probability . . . . This law is no frivolous pretext for giving money to a private school but the using of a private school to attain a public purpose. What benefit is derived by the medical school is necessary and incidental to the main purpose.
Warren v. Reuter, 44 Wis.2d at 214.
Several important similarities exist between the circumstances in Warren v. Reuter and the program here considered. In both instances. state funds were given to a private entity (or individual). *Page 30 
However, as the court in Warren v. Reuter noted, this fact alone does not overcome the overriding public purpose. In Warren v.Reuter, a private school was utilized to attain a public purpose; in the instant case, private farmers will be used to attain the legislative or judicially defined public purpose of protecting state waters from water pollution. The message is clear: if a public purpose exists. as it does with the Program, the use of private entities to attain that public purpose will not in any way diminish the purpose.
Furthermore, in another closely related factual situation, I opined that the Mining Investment and Local Impact Fund Board (Mining Board) could, without violating the public purpose doctrine, make grants to municipalities for mining-related losses incurred by private landowners. 70 Op. Att'y Gen. 48 (1981). The grants under that program were to be distributed to farmers whose wells were contaminated by mine closings as well as to private property owners required to fence in abandoned mine shafts situated on their property. I noted the fact that the adverse problems created by mining activities, primarily contamination of water supplies and mine shaft cave-ins, occurring on private land did "not abrogate the underlying public scope of the problem and public purpose in providing a remedy for them." 70 Op. Att'y Gen. at 53. The opinion concluded that the curing of the defects on private land was certainly "necessary and reasonable to the main purpose of the fund . . . ." 70 Op. Att'y Gen. at 53.
Again, as with Warren v. Reuter the comparisons between that attorney general's opinion and the instant case abound. In the former, the Mining Board distributed funds to municipalities, which in turn distributed them to farmers. The same system of distribution of grants exists in the Program. In both, individuals ultimately receive state funds to be used on their private property.
The expenditure of state funds to a private individual obviously provides some benefit, even if only minimal, to the individual. However, just as a stream or lake does not necessarily stop at an individual's property line, the benefits do not flow only the individual. Rather, the benefits flow to the public as a whole. The statutes are replete with examples of legislative policies aiding what would otherwise be entirely a private purpose but for its public benefit aspects. See 56 Op. Att'y Gen 233, 241-42 (1967). *Page 31 
Furthermore, the local nature of any project does not diminish the public purpose of the Program:
 ". . . The existence of local conditions which, because of their nature and extent, are of concern to the public as a whole, the modes of advancing the public interest by correcting them or avoiding their consequences, are peculiarly within the knowledge of the legislature, and to it, and not to the courts, is committed the duty and responsibility of making choice of the possible methods."
State ex rel. Thomson v. Giessel, 265 Wis. 207, 216,60 N.W.2d 763 (1953).; see 70 Op. Att'y Gen. at 51-52
As a final note, it should be recognized that the Public Purpose Doctrine is not a static doctrine; it evolves to meet the needs of the public. The supreme court has recognized that "[t]he trend of both legislative enactments and judicial decisions is to extend the concept of public purposes . . . ." Hammermill,58 Wis.2d at 55. Moreover, the court has stated that "the legislature is not restricted to the concept of public purpose as it had been understood in years gone by." State ex rel. Bowmanv. Barczak, 34 Wis.2d 57, 64, 148 N.W.2d 683 (1967).
It is my opinion that the issuance of state general obligation bonds under section 92.32 to provide funds for the design and construction of animal waste treatment or storage facilities or permanent runoff control structures does not violate the public purpose doctrine.
II. Article VIII, Section 10: Internal Improvement Prohibition.
Article VIII, section 10 of the Wisconsin Constitution provides in part: "The state shall never contract any debt for works of internal improvement, or be a party in carrying on such works . . . ."
The term "internal improvement" has proven difficult to define.Eich, 1970 Wis. L. Rev. at 1173. At an early date, in State exrel. Jones v. Froehlich, 115 Wis. 32, 38 (1902), the Wisconsin Supreme Court provided the following problematic definition: "[t]hose things which ordinarily might, in human experience, be expected to be undertaken for profit . . ." but excluding those other things which primarily and preponderantly merely facilitate the essential functions of government." Commenting on this definition at a later date, the court admitted "[t]he intervening years have proved, if *Page 32 
nothing else, that the application of an abstract definition of the term has proved difficult." Warren v. Nusbaum,59 Wis.2d at 435.
Subsequently, despite the failure of its earliest attempt to define the term, in State ex rel. Owen v. Donald, 160 Wis. 21,151 N.W. 331 (1915), the Wisconsin Supreme Court adopted the following definition of "internal improvement":
 "Works of internal improvement," as used in the constitution, means, not merely the construction or improvement of channels of trade and commerce, but any kind of public works, except those used by and for the state in performance of its governmental functions, such as a state capitol, state university, penitentiaries, reformatories, asylums, quarantine buildings, and the like, for the purposes of education, the prevention of crime, charity, the preservation of public health, furnishing accommodations for the transaction of public business by state officers, and other like recognized functions of state government.
Owen, 160 Wis.2d at 79. This definition of "internal improvement" was approved and adopted by the court in State exrel. Thomson v. Giessel, 267 Wis. 331, 343, 65 N.W.2d 529 (1954), and has endured to the present.
While adopting the above definition, the court has at the same time recognized, as it did with the Public Purpose Doctrine, that the definition is not static. Reenacting upon the doctrine's evolution, the court commented: "An examination of the cases coming before this court over the last seventy years leads to the conclusion that both this court and the legislature have been cognizant of changing times and the ever-changing needs of the state and its people." Warren v. Nusbaum, 59 Wis.2d at 435-36. In one of the most significant cases of that period, La Follette,33 Wis.2d at 402, the court had stated that the constitution must be interpreted "in light of existing conditions" and given "`that meaning which could have been expressed when adopted if the present conditions . . . had then existed or had been within the contemplation of those who drafted the instrument.'"
As evident from the judicial definition of the term "internal improvement," several recognized activities of state government are excluded from the prohibitions of that clause. Two of the stated exceptions are of significance to your inquiry — state activities concerning *Page 33 
the "preservation of public health" and "other like recognized functions of state government."
In La Follette, 33 Wis.2d at 304, the Wisconsin Supreme Court considered the question of whether a law providing state aid to municipalities for the financing and construction of sewage treatment plants violated article VIII, section 10. The court stated that prohibited works of internal improvement did not include those works which had the dominant purpose of preservingpublic health. After arriving at that determination, the court concluded: "[M]atters pertaining to the abatement of water pollution are governmental functions of the state of Wisconsin and . . . water pollution prevention and abatement facilities are not works of internal improvement within the prohibition of sec. 10, art. VIII, Const." La Follette, 33 Wis.2d at 403. Accord,Wisconsin Solid Waste, 70 Wis.2d at 492; Warren v. Nusbaum,59 Wis.2d at 436-38.
It is my opinion that the funding and construction of animal waste treatment or storage facilities or permanent runoff control structures has as its dominant purpose the furtherance of public health. Applying the dominant purpose rationale of WisconsinSolid Waste, Warren v. Nusbaum and La Follette, I believe the Act is furthering a governmental function and, therefore, it is exempted from the prohibition of the "internal improvements" clause. I specifically rely on the court's conclusion in La Follette, 33 Wis.2d at 403, wherein it was stated that "matters pertaining to the abatement of water pollution are governmental functions . . . ."
Moreover, the decrease in water pollution resulting from the treatment, control and storage of animal waste will most certainly protect public safety. In 57 Op. Att'y Gen. 227, 230 (1968), I recognized that although the definition of a governmental function does not expressly include public safety it does include "`other like recognized functions of state government.'" Based on that phrase, I stated the following conclusion: "I know of no more universally recognized function of government at any level than the protection of public safety . . . ."
It is my opinion that the Program established pursuant to section 92.32 is a proper governmental function and, therefore, the Program does not violate article VIII, section 10 of the Wisconsin Constitution. *Page 34 
III. Article VIII, Section 3.
Your last area of concern involves article VIII, section 3 of the Wisconsin Constitution. That provision provides that "the credit of the state shall never be given, or loaned. in aid of any individual, association or corporation."
While article VIII, section 3 has not been as exhaustively treated in the decisions of the Wisconsin Supreme Court, the court has had occasion to clarify its meaning. Whenever it has done so, however, the court has focused on the meaning of the phrase "giving or loaning" of the state's credit. Warren v.Nushaum [Nusbaum], 59 Wis.2d at 431, 432; Hammermill, 58 Wis.2d at 62.Bowman, 34 Wis.2d at 73; La Follette, 33 Wis.2d at 397-98;Thompson v. Giessel, 271 Wis.2d at 28; Dammann, 228 Wis. at 197. In those decisions, the "giving or loaning" of state credit only occurred when it resulted in the creation of a legally enforceable obligation on the state's part to pay one party an obligation incurred in favor of that party by another party. Id. In other words, the court has consistently held that article VIII, section 3 only prohibited the state from incurring a legally enforceable obligation by acting as a guarantor or surety.
In past opinions, this office has also focused on that particular phrase and similarly interpreted the entire constitutional provision. 66 Op. Att'y Gen. 9 (1977). If I were to follow the limited approach of those opinions here, I would readily opine that the Program does not violate article VIII, section 3. While I reach the same conclusion, I choose not to so restrict my examination.
Limiting the analysis to the creation of an obligation is not surprising when one considers the economic history of state government during the period in which the Wisconsin Constitution was drafted. Historian George Rogers Taylor, in TheTransportation Revolution, describes state financing and borrowing during this period as follows:
 The growth of state debts for the purpose of financing internal improvements, largely canals, was gradual until about 1830 . . . . Then in the 1830's the first real boom in state-financed internal improvements took place. During 1830-1838 states borrowed nearly $150,000,000, and by 1838 the total of their outstanding debt amounted to $170,806,187 . . . . As long as the boom lasted, the states had little trouble in borrowing by selling their bonds either at home or abroad . . . . But the era came definitely to an *Page 35 
end with the second crisis, which broke in 1839. By that time the states had definitely exhausted their credit, and it had become apparent that the expected returns on their investments in banks and internal improvements would not materialize. Instead of receiving the major part of their income, as had been expected, from their investments in banks or internal improvements, the states were suddenly faced with the necessity of taxing their citizens in order to meet the interest on debts incurred in order to promote banking or public works projects . . . . By December, 1842, Florida, Mississippi, Arkansas, Indiana, Illinois, Maryland, Michigan, Pennsylvania, and Louisiana had defaulted on at least some of their obligations, and Ohio and New York were saved from similar humiliation only by taking extra ordinary measures.
 "Efforts at further borrowing were now hopeless, and for nearly a decade the states struggled to recover financial solvency . . . . Three states and the Territory of Florida actually repudiated bonds . . . . The other states, those which had fallen into grave financial difficulties but did not repudiate their obligations, were forced to take strenuous measures to meet interest payments on their swollen debts. Most states now sold the securities and the public works they owned for what these would bring . . . . In addition, though some put it off as long as possible, practically all of the states in financial difficulties now had seriously to begin to tax. In an attempt to avoid levying substantial general property taxes, a number of states imposed taxes on banks and other corporations while others attempted to raise money by licenses on occupations. Attempts to impose state income and inheritance taxes brought in but little revenue. Finally, most states were forced to lean heavily on general property taxes . . . . This was a decade [1850-60], it will be remembered of such tremendous enthusiasm for railroads that undoubtedly the increase in state debts for this purpose would have been much larger had it not been for a number of important restraining influences: 1) some of the states had not yet recovered their credit and were burdened with heavy debts incurred during the thirties; 2) nineteen states had been so affected by this severe crisis following the boom of the thirties that they had amended their constitutions so as to impose debt limitations upon themselves; . . ." *Page 36 
George Rogers Taylor, The Transportation Revolution, Holt, Rhinehart and Winston, New York 1962, pp. 374-7.
The Wisconsin Constitution was drafted during the period when other states were feeling the effects of the severe financial crisis described above. This historical background goes a long way toward explaining the stringent financial limitations found in article VIII of the Wisconsin Constitution — particularly sections 3 and 10. It also explains why the framers of the Wisconsin Constitution included a specific section to prevent the state from acting as a surety or guarantor of the collateral obligation of another party. See also, the discussion in Sloan, Stevens Morris v. The State, 51 Wis. 623, 629-30,8 N.W. 393 (1881); accord, Wein v. State, 39 N.Y.2d 136,347 N.E.2d 586 (1976).
Like the other constitutional limitations upon state financing activities, article VIII, section 3 has been interpreted by the court primarily in the context of pre-1969 "dummy" corporation devices. Those prior interpretations do not reflect the present reality of the state itself being able to provide or use credit rather than loaning its credit elsewhere. Wis. Const. art. VIII, sec. 7(2)(a). In fact, your inquiry is premised upon a transaction involving this change of circumstances. For this reason, I believe it is now appropriate to shift the focus of the inquiry.
Article VIII, section 3 prohibits the giving or loaning of the credit of the state "in aid of any individual . . . ." It is my opinion that if it can be determined that the funds in the Program are not given in aid of an individual, then there can be no infringement of this constitutional provision. It is true that the funds administered through the Program will ultimately be received by individuals for facilities and structures to be constructed on private land. However, the Wisconsin Supreme Court long ago held that the state does not lend its credit within the meaning of this constitutional provision by merely making a voluntary lawful gift to a number of citizens. Appeal of VanDyke, 217 Wis. 528. 545, 259 N.W. 700 (1935); State ex rel.Atwood v. Johnson, 170 Wis. 251, 176 N.W. 224 (1919). Therefore, it is necessary to analyze in a general sense what actually takes place when the Program disburses funds to individuals.
An understanding of the regulatory scheme of the Department of Natural Resources which led the Legislature to create the Program is essential. Chapter NR 243 Wis. Adm. Code entitled *Page 37 
"Animal Waste Management" was promulgated by the Department of Natural Resources pursuant to chapter 147. The stated purpose of that chapter is to eliminate the discharge of pollutants into the waters of the state. Sec. 147.01, Stats. "Pollutant" is defined in that chapter to include agricultural waste. Sec. 147.015, Stats.
Chapter NR 243 Wis. Adm. Code establishes design standards and accepted animal waste management practices for the large animal feeding operations category of point sources. See sec. 147.015 (8), Stats. The chapter also establishes the criteria under which the Department of Natural Resources may issue a permit to other animal feeding operations which discharge pollutants to waters of the state. Section NR 243.21 Wis. Adm. Code authorizes onsite investigation by the Department of Natural Resources to determine whether unacceptable practices of an operation are causing or have caused the discharge of a significant amount of animal waste pollutants to the waters of the state. Both large and small operators which fail to take corrective measures in a specified period of time are required to obtain a permit which may contain a schedule of compliance designed to implement accepted waste management procedures necessary to control the discharge. SectionNR 243.24 Wis. Adm. Code. Compliance includes the construction of structures and facilities necessary to control the discharge. Violation of the foregoing rules may lead to the enforcement of civil and criminal penalties. Secs. 147.21 and 147 29, Stats.
In my view, the Legislature created the Program to facilitate the construction of facilities and structures to protect the state's surface waters from the adverse effect of animal water pollution in accordance with the policy and purposes of chapter 147. The facilities and structures designed to treat, store or control runoff of animal waste are required by the Department of Natural Resources, not "in aid" of any individual, but "in aid" of the public purpose of eliminating water pollution. Therequired facilities and structures must be built on private land. However, they provide the individual with only an incidental private benefit.
Because the private benefit is only incidental to the dominant purpose for the Program, the instant matter may be distinguished from others where the individual derives more than an incidental private benefit. Your example, suggesting that warm clothing that contributes to an individual's health could be deemed necessary for *Page 38 
public health and welfare, falls in the latter category. Certainly, one cannot argue in such a situation that the individual does not receive much more than an incidental private benefit.
I wish to be clear that the issuance of general obligation bonds requires more than satisfaction of the public purpose test. As previously pointed out in 63 Op. Att'y Gen. 342, 343 (1974), "[g]eneral obligation bonding never was intended to be a substitute for the direct appropriation of tax revenues for financing any state program possessed with a public purpose." Article VIII, section 7, paragraphs (1) and (2)(a), enumerate the purposes for which the state may contract debt. One of the purposes enumerated for the creation of public debt includes the improvement of waters. In my opinion, article VIII, section 7 (2)(a) provides authority for the state to borrow money to make funds available for the Program.
BCL:JSS