FRED A. RISSER, Chairman, Committee on Senate Organization
The Committee on Senate Organization has requested my opinion on the legality of the actions of the Department of Administration (DOA) in agreeing to and implementing without approval of the Joint Committee on Employment Relations (JOCER) a "$200 loan" and a "non-recrimination clause" for employes engaging in strike activities during last summer's labor dispute between the State of Wisconsin and the Wisconsin State Employees Union (Union).
During the course of negotiations for a 1977-79 contract DOA and the Union agreed to the following provisions, the first of which is the so-called "$200 loan" and the second of which is the so-called "non-recrimination agreement":
 "Each WSEU represented employe who has less than five (5) days pay earned during the pay period ending July 16, 1977, will upon application, be eligible to receive a $200.00 wage advance on July 28, 1977, or as soon thereafter as possible. Employes who receive such wage advance shall have $67.00 deducted from their pay on August 11, 1977, $67.00 deducted from their pay on August 25, 1977, and $66.00 deducted from their pay on September 8, 1977. Employes who retire or resign or otherwise leave State service after receiving the $200.00 advance but before the above deductions are made shall have *Page 39 
the $200.00 or balance advanced deducted from their final pay check." (The dates referred to are the regular bi-weekly pay periods; the state has adopted a bi-weekly payroll system which includes a net ten-day lag period.)
 "It is agreed by and between the State as an Employer and the Wisconsin State Employees Union (Union) that all legal proceedings previously commenced by and against each of them, their officers, agents or any employee occupying a position in any bargaining unit exclusively represented by said Union relating to any job action which began on or about July 3, 1977 and which ended on or about July 17. 1977 shall be dismissed with prejudice and without costs.
 "It is further agreed that any legal proceedings, in equity or law, which may arise or have arisen as a result of the negotiations, job actions or strike activity relative to a successor collective bargaining agreement to that expiring June 30, 1977, are hereby waived, forgiven and abandoned by the Union and the State.
 "It is expressly agreed and understood by and between the parties hereto that the instant agreement applies to, by way of illustration rather than limitation, the litigation now pending in the Circuit Courts for Chippewa County, Dane County, and Racine County, all brought in the name of the State of Wisconsin as well as the Wisconsin Employment Relations Commission (WERC).
 "Consistent with the foregoing and consistent further with the parties desire to promote amicable and peaceful labor relations the State shall not penalize, directly or indirectly, any permanent or seasonal employee represented or not represented by this Union by way of discharge, suspension, a letter of reprimand, etc., for his/her participation in any job action or strike or for any conduct indirectly associated with the foregoing, except that the State reserves the right to take appropriate disciplinary action, not to exceed five days suspension without pay, against any employee at the Wisconsin State Prison and the Ethan Allen School for Boys who engaged in any breach of security causing a threat to state or personal property or to public or personal safety. The State may suspend *Page 40 
with pay employees suspected of engaging in the above breaches or security during the investigation of such actions. The State also reserves the right to take appropriate disciplinary action, not subject to the limitations above, against any employee who engaged in criminal acts.
 "Appeals of discipline for criminal acts shall be covered by the grievance procedure of the collective bargaining agreement; however, appeals of discipline for breaches of security shall be filed directly at Step Four of the grievance procedure and shall be submitted to an arbitrator selected by mutual agreement from a list of arbitrators provided to the parties by the American Arbitration Association.
 "Inasmuch as a bona fide dispute has arisen between the parties hereto as to the applicability of the mediated non-recrimination agreement which was consumated [sic] on or about Sunday, July 17, 1977, to Limited Term Employees (LTE's) the parties hereto shall submit the matter to Ronald W. Haughton, Wayne-State University, Detroit, Michigan, as an Arbitrator, for a final and binding determination. The submission shall be as soon as possible. The aforementioned interpretation/determination by the Arbitrator shall be reduced to writing, signed by the Arbitrator and shall be binding on the parties. The services of said Arbitrator shall be immediately requested by the parties in a joint fashion.
 "The costs and expenses shall be borne equally between the parties.
 "It is agreed that former Mediator Robert G. Howlett shall be used as a witness by at least one and perhaps both of the parties."
These clauses were apparently submitted as concepts to the membership of the Union for ratification although final language was not available at the time of ratification. Neither clause was submitted to the Joint Committee on Employment Relations for approval.
The State Employment Labor Relations Act (SELRA) sets forth the duties, responsibilities and authority of DOA with respect to labor relations in state employment. Under SELRA collectively *Page 41 
bargained contracts replace civil service and other applicable statutes relating to wages, hours and conditions of employment for those employes who are properly included in recognized bargaining units. Sec. 111.93, Stats.
Section 111.81 (16), Stats., provides in part:
 ". . . It is the responsibility of the executive branch to negotiate collective bargaining agreements, and to administer such agreements. To coordinate the employer position in the negotiation of agreements, the executive branch shall maintain close liaison with the legislature relative to the negotiation of agreements and the fiscal ramifications thereof. The department of administration is responsible for the employer functions of the executive branch under this section, and shall coordinate its collective bargaining activities with operating agencies on matters of agency concern. It is the responsibility of the legislative branch to act upon those portions of tentative agreements negotiated by the executive branch which require legislative action."
Section 111.91, Stats., defines those matters affecting wages, hours and conditions of employment that are subject to collective bargaining. Where agreement on such matters is reached by the state and state employes in recognized collective bargaining units, the terms may be included in a collective bargaining agreement. Sec. 111.81 (2), Stats. After an agreement becomes effective, the parties are bound by the terms contained therein. If, however, after bargaining in good faith the parties fail to reach agreement on a mandatory subject, the employer may in some circumstances unilaterally take action on that matter. Sec.111.81 (2), Stats. See, e.g., United Fire Proof Warehouse Co. v.N.L.R.B., 356 F.2d 494, 497 (7th Cir. 1966).
Section 111.92, Stats., sets forth the procedures required for implementation of collectively bargained agreements in the following terms:
 "(1) Tentative agreements reached between the department of administration, acting for the executive branch, and any certified labor organization shall, after official ratification by the union, be submitted to the joint committee on employment relations, which shall hold a public hearing before determining *Page 42 
its approval or disapproval. If the committee approves the tentative agreement, it shall introduce in companion bills, to be put on the calendar, that portion of the tentative agreement which requires legislative action for implementation, such as salary and wage adjustments, changes in fringe benefits, and any proposed amendments, deletions or additions to existing law. Such bills shall not be subject to ss. 13.10 (1), 13.50 (6) (a) and (b) and 16.47 (2). The committee may, however, submit suitable portions of the tentative agreement to appropriate legislative committees for advisory recommendations on the proposed terms. The committee shall accompany the introduction of such proposed legislation with a message that informs the legislature of the committee's concurrence with the matters under consideration and which recommends the passage of such legislation without change. If the joint committee on employment relations does not approve the tentative agreement, it shall be returned to the parties for renegotiation. If the legislature does not adopt without change that portion of the tentative agreement introduced by the joint committee on employment relations, the tentative agreement shall be returned to the parties for negotiation.
 "(2) No portion of any tentative agreement shall become effective separately." (Emphasis added.)
Following official ratification by the Union, tentative agreements are submitted to JOCER. The tentative agreement must be approved by JOCER before any provision becomes effective. Following approval, JOCER determines what portions of the tentative agreement require legislative action for implementation, such as "salary and wage adjustments, changes in fringe benefits, and any proposed amendments, deletions or additions to existing law." The Legislature must then enact legislation before any portion of the tentative agreement becomes effective.
$200 SALARY ADVANCE
Prior to the time JOCER met to consider the tentative agreement, DOA authorized the implementation of the $200 salary advance by personnel in each agency responsible for payroll. A DOA directive dated July 20, 1977, stated: "When a WSEU represented employe specifically requests the $200 salary advance the agency payroll clerk *Page 43 
should verify the employe's eligibility to receive the advance (i.e., would otherwise receive less than five days' pay on July 28, and has earned at least $200 since July 16)."
The $200 salary advance provision was never submitted to JOCER as part of the tentative agreement between the parties. I view the $200 not as a loan but rather as an advance on salary earned but not paid. In analyzing whether or not DOA had authority to agree to this provision the key language is that portion of sec.111.92, Stats., which provides that "No portion of any tentativeagreement shall become effective separately" (emphasis added).
Under the state's bi-weekly payroll plan, striking employes who did not work during the two-week period July 3 through July 16 would not have received any wages on July 28, 1977, the date when wages for that period were paid. This was so because even though striking employes may have worked during the next two-week period (July 17 through July 30), they would not normally be paid for that period until August 11, 1977. The ten-day delay or lag in payment of wages earned is necessary in order to permit DOA to efficiently administer the state payroll. The length of this lag period is a mandatory subject of bargaining under sec. 111.91.
It has been suggested that the $200 salary advance provision was not a portion of the "tentative agreement" because it was not submitted to JOCER. Such an interpretation would allow the Union and DOA to determine what is to become a part of the "tentative agreement." This ignores the obvious legislative intent in sec.111.92 (2) to have JOCER approve agreements reached between the state as an employer and the Union.
I construe the words "tentative agreement" broadly to include any matters within the scope of bargaining agreed to by the parties. Section 111.92 (2) represents a condition precedent to the effectiveness of any provision which is "tentatively" agreed to by the Union and DOA. One can only conclude that such a term was a material portion of the overall agreement between the parties. I am therefore of the opinion that the "$200 salary advance" was not effective or legally enforceable at any time and is not a part of the contract between the parties.
The "$200 salary advance" was implemented by DOA and persons covered by the agreement were paid. You ask whether this *Page 44 
implementation is an illegal act without JOCER approval. Rather than characterize the implementation as "legal" or "illegal" it would be better to use the concepts "authorized" or "unauthorized." For the reasons stated above I would conclude that the implementation was unauthorized. I would like to point out that in the normal collective bargaining relationship a union and an employer have flexibility in negotiating agreements and in deciding which matters will be included in the formal and binding collective bargaining agreement. Where, as here, there are conditions precedent to effectiveness and the parties wish to agree to terms which cannot await the occurrence of conditions precedent it may be desirable for the employer to have the flexibility to implement portions of the agreement in order to maintain relations with the union and avoid unfair labor practice charges. Likewise, it is common for employers to have the authority to act unilaterally during the hiatus between contracts. Normally, the fact that a union may agree with the employer's actions during the hiatus does not give rise to a tentative agreement.[1] These two theories would support Secretary Torphy's actions here absent the clearly expressed legislative desire to control the final terms of agreements reached by the state and its employe unions.
It is also interesting to consider whether such unilateral action by DOA violated other state statutes. Section 16.53
(1)(d)1., Stats., provides:
 ". . . The secretary of administration, with the approval of the joint committee on employment relations, shall fix the time and frequency for payment of salaries due elective and appointive officers and employes of the state government. As determined under this subdivision such salaries shall be paid either monthly, semimonthly or for each 2-week period." (Emphasis added.)
Section 16.53 (1)(d)1., Stats., requires the Secretary to secure JOCER approval in fixing the time and frequency for payment of state employes' salaries. "Frequency" refers to how often employes will be paid, i.e., monthly, semi-monthly, weekly, etc. "Time," on the other hand, refers to when employes will be paid. The question of when employes are to be paid is related to wages, hours and conditions of employment within the meaning of sec. 111.93 (3). *Page 45 
Under sec. 111.93 (3) no labor agreement existed at the time the "$200 loan" agreement was made between the Secretary of DOA and the Union. Thus, sec. 16.53 (1)(d) 1., Stats., applies and requires JOCER approval in fixing the time for payment. Since JOCER approval was not secured for this change in the time of payment of salaries, sec. 16.53 (1)(d)1. appears not to have been followed. I would also point out that sec. 16.53 (1) (d) 1., Stats., is ambiguous. I would invite the Legislature to look at this section in light of the provisions of the State Employment Labor Relations Act and to clarify legislative intent if not consistent with this opinion.
You also ask whether the salary advance to individual employes who had engaged in the illegal strike violates the Wisconsin Constitution. Two constitutional provisions must be considered: first, the public purpose doctrine; and second, the prohibition of Wis. Const. art. VIII, sec. 3, against the lending of state credit. It is my opinion that neither provision has been violated. Although no specific clause in the constitution establishes the "public purpose doctrine," it is a well-established constitutional tenet that expenditure of public funds for private purposes is prohibited. Hopper v. Madison, 79 Wis.2d 120,128, 256 N.W.2d 139 (1977); State ex rel. Warren v. Nusbaum,59 Wis.2d 391, 413-414, 208 N.W.2d 780 (1973); State ex rel.Hammermill Paper Co. v. La Plante, 58 Wis.2d 32, 47-48,205 N.W.2d 784 (1973). Clearly, the payment of wages to state employes who were legally entitled to receive such wages cannot be considered a violation of the public purpose doctrine. Because the salary advance amounts to payments of monies already earned, it cannot violate the provision against lending of state credit.
NON-RECRIMINATION AGREEMENT
As noted above, DOA has been given certain duties and responsibilities relating to employment relations in state employment. Section 111.89 (1) provides that: "Upon establishing that a strike is in progress, the employer may at his option either seek an injunction or file an unfair labor practice charge with the [Wisconsin Employment Relations] commission under sec.111.84 (2)(e) or both." DOA has been given the responsibility to decide whether to seek an injunction or file an unfair labor practice charge. The choice of remedies under sec. 111.89, Stats., does not limit the state's right to take other appropriate action in a strike *Page 46 
situation where the public interest is at stake. Thus, for example, the state could use National Guard personnel to ensure uninterrupted delivery of essential state services during an employe strike.
Pursuant to sec. 111.81 (16), Stats., the employer functions of the executive department of the state are vested in DOA. In addition, sec. 165.08, Stats., provides in pertinent part:
 "POWER TO COMPROMISE. Any civil action prosecuted by the department [of Justice] by direction of any officer, department, board or commission, shall be compromised or discontinued when so directed by such officer, department, board or commission. . . ."
For the reasons stated above with respect to the so-called "$200 salary advance," I am of the opinion that the non-recrimination provision is not enforceable without approval by JOCER and that implementation of the clause is unauthorized. This clause was a material portion of the overall settlement reached between the parties. I take notice of the fact that both parties would concede that the agreement to this provision facilitated settlement of the labor dispute and was treated as a key to agreement by both parties to the negotiations.
To say that this provision need not be ratified or approved by JOCER is to say that DOA and the Union can, by not forwarding certain clauses to JOCER, define certain provisions out of any "tentative agreement." Such a construction would be absurd. If a provision as important to the overall settlement as this one can be so treated, any other provision could be similarly determined to be outside of the "tentative agreement." Such an interpretation would thwart the obvious legislative intent to have final approval and control over the terms of labor relations settlements reached between state employes and DOA acting for the state in JOCER. Consequently, I conclude that this term is ineffective and legally unenforceable unless approved by JOCER.
At most, the so-called non-recrimination agreement represents a statement of intent by the Secretary of DOA. Taken together, the statutory provisions discussed above suggest that when state employes engage in illegal strikes, it is the responsibility of DOA (and not JOCER) to decide whether to initiate civil action for injunctive relief and when appropriate to discontinue such legal *Page 47 
action. Although DOA could discontinue civil actions associated with strike activity it could not terminate other legal proceedings being prosecuted by the state nor could it interfere with the authority of the courts to proceed in contempt when injunctions against strike activities have been granted. The Department of Administration could also agree not to press unfair labor practices charges based on the strike. To the extent that this limited effect was given to the clause by the parties, Secretary Torphy probably acted within his authority in agreeing to the clause although it should have been submitted as a tentative agreement.
I also doubt whether the provisions of the non-recrimination agreement, even if approved by JOCER, would be enforced by courts since the agreement could be considered inconsistent with the public policy against strikes and strike activities by state employes as declared by the Legislature in secs. 111.84 (2)(e) and 111.89, Stats.
Consequently, I conclude that the non-recrimination agreement is unenforceable because it has not been approved by the process for approval of tentative agreements contained in the statutes, and is void as against public policy. To the extent that the Secretary of DOA was willing to commit himself and his Department on matters within the scope of his authority, he could do so but such agreement could not bind other departments or officers.
BCL:DJH:JDN
[1] See discussion immediately below on the effect of sec.16.53 (1)(d)1., Stats.