TIM CULLEN, Chairperson Senate Organization Committee
You have requested, on behalf of the Senate Organization Committee, my opinion on the following question:
 Does the inclusion of officers, directors, employees and agents of the Historic Sites Foundation, Inc., within the state's risk management program as provided by 1985 Wisconsin Acts 29 and 66, creating Wisconsin Statute section 895.46(1)(e), violate any constitutional provision?
 BACKGROUND
It is necessary to understand the relationship between the State Historical Society (Society), the Historic Sites Foundation, Inc. (Foundation), and the Circus World Museum (Museum) at Baraboo, Wisconsin.
The Society is a state agency. OAG 11-85. It is empowered to "enter into a lease agreement with the [Foundation] for the purpose of operating [the Museum], located at Baraboo, Wisconsin." Sec. 44.16(1), Stats., created by 1985 Wisconsin Act 29, sec. 755.
The Society acquired the Museum by gift in 1959. The Society owns the Museum entirely, including all real and personal property.
The Museum provides live demonstrations for public viewing. These include demonstrations on circus animal training; loading wagons on circus trains in the manner done from 1872 to 1956; a 55-minute big top performance with acts chosen for historic merit, including acts of elephants, horses, dogs, and clowns and aerial artists; a high wire walk; a clown show of the 1820-1830 vintage; a recreation of an 1830 circus street parade; an elephant playtime swim in the Baraboo River; tiger feeding and lecture; and a unique instruments concert with instruments dating back to the 1920's. A library of circus history adjoins these grounds. *Page 183 
In concluding that the Museum is not subject to a sales tax on admission charges, the Wisconsin Tax Appeals Commission said the Museum's primary objective is "the collection, preservation and dissemination of the history of the Wisconsin circus heritage."Historic Sites Foundation, Inc. v. Wisconsin Department ofRevenue, No. S-10066 (Jan. 21, 1986) (decision slip op. at 17). The Society is charged with the duty to promote the collection, advancement, and dissemination of knowledge of the history of Wisconsin and the West. Sec. 44.02(15), Stats. "The purpose of the [Society's] owning the [Museum] site is to let people know one aspect of the rich history and heritage of Wisconsin."Historic Sites Foundation, Inc., at 17-18. The Museum "is a fun way to learn about circus history." Id. at 20.
The Foundation is a private corporation created in 1960 under chapter 181, Stats., to operate the Museum. The articles of incorporation provide that the Foundation is organized "exclusively for educational, scientific and literary purposes . . . all for the benefit of" the Society. In fact, its sole function consists in operating the Museum. It has twelve directors: an appointee of the Governor, subject to senate confirmation, see sec. 44.16(2), Stats., as created by 1985 Wisconsin Act 29; the Mayor of Baraboo; the chair of the Sauk County Board; two curators of the Society; and a legislator. The remainder are appointed by the Society's Board of Curators.
The lease and management agreement recites that the Society retains the Foundation as the "manager, operator and promoter" of the Museum. The Society leases all its Museum property, real and personal, to the Foundation. The Foundation's duties include:
 [G]athering, collecting and properly displaying printed manuscript materials and artifacts; establishing, maintaining and operating a circus museum and library; sponsoring or conducting research in circus history and publishing the results; encouraging in every possible way an appreciation of the role of the circus in American life through a combination of activities which educate, inform and entertain the public both on the property of the Museum and elsewhere as the Foundation shall determine.
Lease, para. 2. Section 44.16(1), provides that the lease between the Society and the Foundation "shall not include any provision for the payment of a percentage of gross admissions income at Circus World Museum to the historical society." By the terms of the lease, *Page 184 
the Foundation must insure the Society's property; the Foundation supplies the Society with minutes of meetings of its directors and committees, as well as financial statements; and all Foundation publications and stationery must clearly identify the Museum as the property, of the Society. Further, the Society must approve all long-range Foundation planning, all additions of real property and all accessions. Any property acquired by the Foundation must be transferred to the Society. State procedures must be followed in selling personal property. All general purpose state funding must be used to reduce admission fees. The Foundation's board must comply with the open meetings law, and its corporate records are open to inspection the same as with any state agency. The Foundation must follow state affirmative action and equal opportunity policies, and the directors and employes must comport themselves under the ethical standards applicable to state officials and employes. On dissolution, the articles of incorporation require distribution of the Foundation's assets to the Society.
The legislation I am asked to opine on, 1985 Wisconsin Act 29 as amended by 1985 Wisconsin Act 66 ("Act"), has the effect of giving the Foundation and its directors, officers, employes, and agents the same liability protections as are enjoyed by state officers, employes and agents. The consequence is that no action may be brought against them unless, within 120 days of the event complained of, notice is given to the attorney general as required by section 893.82; no compensatory damages in excess of $250,000 may be recovered against any one defendant; no punitive damages may be recovered; the attorney general will provide legal representation; and the state will indemnify the defendant for judgments and costs rendered. More specifically yet, the Act extends this treatment to the individuals and to "any nonprofit corporation operating a museum under a lease agreement with" the Society. The Foundation is treated as a department of state for purposes of requesting representation by the attorney general.See sec. 165.25(8), Stats., as created.
PUBLIC PURPOSE
The first issue is whether the Act furthers a statewide public purpose. Although the public purpose doctrine is not found in the state constitution in express terms, the rule that public funds must be expended only for a public purpose is a well-established constitutional tenet. Wisconsin Solid Waste Recycling Auth. v.Earl, 70 Wis.2d 464, 478, 235 N.W.2d 648 (1975). Additionally, state funds *Page 185 
may be spent only if the purpose is of statewide concern. Stateex rel. La Follette v. Reuter, 33 Wis.2d 384, 397,147 N.W.2d 304 (1967). It is for the Legislature in the first instance to determine what constitutes a public purpose. The court will sustain the Legislature's determination if any public purpose rationally can be conceived. The challenger's burden is to show there can be no benefit to the public from the expenditure.Hopper v. Madison, 79 Wis.2d 120, 128-30, 256 N.W.2d 139 (1977). The public purpose depends essentially on what the people want and expect. It is a fluid concept; yesterday's hope is today's entitlement. State ex rel. Warren v. Reuter, 44 Wis.2d 201, 213,170 N.W.2d 790 (1969).
Unquestionably the state itself could operate the Museum by state employes rather than through the Foundation. The public purpose is the Museum's contribution to the state's historic appreciation. Indeed, the Society already directly operates other museums. The entitlement of its employes and agents to the state's liability protections cannot seriously be questioned under the public purpose doctrine: Whether seen as an employment fringe benefit or an incentive to render service, the public purpose of the indemnity program is clear.
The fact of the Foundation's private, corporate nature is of no consequence for purposes of the public purpose doctrine. The state may use a private corporate entity to discharge a public purpose, at least so long as the entity remains under state control. See State ex rel. Wisconsin Dev. Authority v. Dammann,228 Wis. 147, 176, 277 N.W. 278, 280 N.W. 698 (1938). Since the public purpose is served by indemnifying private individuals who are state employes when carrying out the state objective of historic circus appreciation, the public purpose is equally served by extending the same benefit to nonstate employes to do the same thing.
But the Act, standing alone, does not freeze the extant Society controls over the Foundation. For example, requiring the Foundation to report to the Society, and to adhere to public records and open meetings law, is established by the lease agreement, not by statute. The Act does not prevent the Foundation from changing its bylaws to staff the board of directors with private, wholly nonpublic officials. The Act does not confine Foundation activities to serving the state's public purpose. Nothing in the Act prevents the Society and the Foundation from deleting the requirement of Society approval over the Foundation's long-term planning. And the *Page 186 
Foundation is empowered to certify that an individual's conduct grew out of his/her duties and to request the attorney general to provide legal representation. Sec. 165.25(8), Stats., as created.
Although the Act, standing alone, has these deficits, other related legislation can be construed as imposing controls to assure public accountability and a public purpose. And the courts will so construe them if necessary to sustain the Act's validity.See Joncas v. Krueger, 61 Wis.2d 529, 535-36, 213 N.W.2d 1
(1973).
First, the Society's only statutory power in this area is to deal with the Foundation "for the purpose of operating [the Museum]." Sec. 44.16(1), Stats., as created. That power implicitly is limited to the public purpose of the state's Museum. While there necessarily is discretion as to the precise terms that may be negotiated with the Foundation, any terms that depart from the public purpose of the Museum would be invalid under section44.16(1). Therefore, reasoning in pari materia, the Act contemplates only the kind of agreement the Society is authorized to make under section 44.16(1). In any event, the Act is operative only to the extent the Society has dealt with the Foundation in terms that comply with section 44.16(1) and the public purpose doctrine.[1]
Second, the Foundation does not have final authority over the decision whether the individual's conduct grew out of duties entitling him or her to legal representation by the attorney general. The attorney general, a popularly elected constitutional officer, may contest the individual's entitlement in court. Sec.895.46(1)(a), Stats. In other words, if in a particular case a defendant's conduct is outside the Society's statutory and public purpose limitations, so as to prevent extending the benefits of state representation and indemnity protection, the attorney general may so contend before a court even if the Foundation asserts otherwise. I believe this mechanism suffices as an additional procedural safeguard against diverting public resources for a nonpublic purpose. *Page 187 
In my opinion, the Act, as construed and limited above, does not offend the public purpose doctrine, but the importance of maintaining ultimate Society control over programming and Foundation accountability to assure that the public purpose of the Museum is preserved, both in theory and in practice, cannot be over emphasized.
EXTENDING CREDIT
A second possible ground of attack on the Act rests on the constitutional provision that "the credit of the state shall never be given, or loaned, or in aid of any individual, association or corporation." Wis. Const. art. VIII, § 3.
This provision applies only if the state acts "as a surety or guarantor of the collateral obligation of another party." Stateex rel. Thomson v. Giessel, 271 Wis. 15, 29, 72 N.W.2d 577
(1955). It does not apply if the state "incur[s] liability directly or only to such other parties as, for example, where the state lawfully employs someone to perform an authorized service for the state." Dammann, 228 Wis. at 197.
The state's liability program is one of indemnity. See Fiala v.Voight, 93 Wis.2d 337, 348, 286 N.W.2d 824 (1980). The defendant controls whether the indemnity is paid, not the plaintiff: it is not paid if the defendant fails to give notice of the action or if the defendant fails to cooperate in the defense. Sec.895.46(1)(a), Stats. The very distinction between an indemnity and a guarantee or suretyship turns on the fact that the indemnity obligation goes to the judgment debtor, not the third-party creditor. See 41 Am. Jur. 2d Indemnity
§§ 1, 4 (1968); 38 Am. Jur. 2d Guaranty §§ 2, 15 (1968). An indemnity program operates "solely for the benefit of the insured . . . ." 8 Appleman, Insurance Law and Practice, § 4831 at 416 (1981). The indemnity obligation arises after
judgment is rendered; it gives the plaintiff no right of action against the state or the indemnitee. See Cords v. Ehly,62 Wis.2d 31, 37-38, 214 N.W.2d 432 (1974). Accord,Duckworth v. Franzen, 780 F.2d 645, 650-51 (7th Cir. 1985) (plaintiff's suit is not one against the state for purposes of the eleventh amendment even "[i]f the state chooses to pick up the tab for its errant officers"). But see Miller v.Smith, 100 Wis.2d 609, 623, 302 N.W.2d 468 n. 16 (1981) (declining to decide whether the indemnity obligation extends only to the judgment debtor). *Page 188 
Here, the indemnity obligation is extended directly to someone (the Foundation, its employes, etc.) that the state has "lawfully employ[ed] . . . to perform an authorized service for the state."Dammann, 228 Wis. at 197. Therefore, there is no more an extension of credit in this case than in indemnifying any other state agent who incurs a judgment for conduct in the scope of his/her agency, e.g., when causing injury to another by negligently driving a car while on state business.
EQUAL PROTECTION
A third possible line of attack rests on equal protection grounds. This attack would have two components. First, the challenge would be from the perspective of the plaintiff whose rights of recovery are limited procedurally and substantively when suing persons protected by the state's indemnity program. The second challenge would assert there is nothing special about the Foundation to distinguish it from other entities which also have a close nexus with the state in discharging various public purpose functions, e.g., authorities, foundations, and other chapter 181 corporations, like the Wisconsin Higher Education Corporation. See OAG 32-85.
The equal protection challenge is tested by the "rational basis" criterion. As stated in Yotvat v. Roth, 95 Wis.2d 357,363-64, 290 N.W.2d 524 (Ct.App. 1980):
 All legislative acts are presumed to be constitutional. A heavy burden is placed upon the party challenging a statute's constitutionality. All doubts must be resolved in favor of the constitutionality of a statute. Stanhope v. Brown County, 90 Wis.2d 823, 837, 280 N.W.2d 711 (1979).
 The appropriate test for review of the classifications of governmental and non-governmental tortfeasors and of their victims is whether a rational basis exists for the differentiation. Stanhope, 90 Wis.2d 823, 837; Binder v. Madison, 72 Wis.2d 613, 622, 241 N.W.2d 613 (1976).
 Stanhope, 90 Wis.2d 823, 837-38, 280 N.W.2d 711, 717, applies the "rational basis" test as described in McGowan v. Maryland, 366 U.S 420, 425-26 (1961):
 "The Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is *Page 189 
offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."
The supreme court earlier had upheld the notice requirement,i.e., plaintiffs' pre-suit duty of filing notice with the governmental unit. The court reasoned it was rationally related to the objective of preserving public property in a safe condition. "The public tortfeasor may conduct a timely investigation of public property, to determine liability and prevent future accidents. The nature of much public property is such as to make it difficult to maintain, and impossible to maintain in completely safe condition at all times." Binder v.Madison, 72 Wis.2d 613, 623, 241 N.W.2d 613 (1976). The notice requirement also enables an investigation of the claim while fresh. Ibrahim v. Samore, 118 Wis.2d 720, 726-27, 348 N.W.2d 554
(1984). As to liability limits, in upholding a $25,000 municipal liability cap the court said: "It is the legislature's function to evaluate the risks, the extent of exposure to liability, the need to compensate citizens for injury, the availability of and cost of insurance, and the financial condition of the governmental units." Sambs v. City of Brookfield, 97 Wis.2d 356,377, 293 N.W.2d 504 (1980). Additionally, the court has sustained tortfeasor classifications designed to enable the government "to provide those services which it believes benefits the citizen[s]," Stanhope v. Brown County, 90 Wis.2d 823, 842,280 N.W.2d 711 (1979), and for its own protection in paying the cost of the judgment. See Ibrahim, 118 Wis.2d at 727; Doe v. Ellis,103 Wis.2d 581, 589-90, 309 N.W.2d 375 (Ct.App. 1981); Binder,72 Wis.2d at 623. In sustaining these classifications, the courts also have looked to the historic differential between public and private tortfeasors. See Stanhope,90 Wis.2d at 838-44, and Sambs, 97 Wis.2d at 372.
But for the private nature of the Foundation, the equal protection issue would easily be resolved vis-a-vis the tort victim. The individuals protected are those who manage the state's own property in discharging the state's mission of historic circus enrichment. The notice requirement serves to assure safe property, to enable a prompt investigation of accidents, and to ultimately protect the indemnity fund. Providing the indemnity induces people to this *Page 190 
public service without fear of personal loss. The alternative of state-purchased liability insurance rationally could be seen as needlessly expensive or, because of its rising costs, prohibitive to the integrity of the historic circus appreciation program.
The fact of the private nature of the Foundation should make no difference. The public purpose remains the same; the property remains the state's; the mission remains the state's; and the risk that liability insurance costs might defeat the best use of this property for the maximum obtainment of historic circus enrichment also remains the state's risk. To be sure, the Legislature could have chosen to appropriate funds directly to the Society to purchase liability insurance as part of the consideration flowing to the Foundation for its services. But the court has rejected this basis of attack. "The availability of liability insurance . . . is not by itself a basis for holding the challenged classification invalid, however. The `rational basis' test for equal protection does not require that the legislature choose the best or wisest means to achieve its goals." Stanhope, 90 Wis.2d at 843. And the rising costs of private liability insurance makes all the more reasonable the choice of bringing the Museum operatives directly within the state's own risk management program.
Moreover, there is nothing novel about establishing different procedures and tort liability rules within the private sector itself. Medical malpractice is a prime example. See Ch. 655, Stats.; 1985 Wisconsin Act 340 ($1 million liability cap). Worker's compensation abrogated certain private sector tort liability altogether in favor of an alternate remedial scheme, and it was sustained over equal protection objections. Borgnis v.Falk Co., 147 Wis. 327, 133 N.W. 209 (1911). Sometimes the law grants a limited class of private entities a qualified tort immunity, but for certain torts only. See New York Times Companyv. Sullivan, 376 U.S. 254 (1964). And sometimes the law grants private actors absolute tort immunity. See sec. 895.48, Stats. (good samaritan law). As to tort law classifications involving the private sector, if the court can "conceive any facts on which the legislation could reasonably be based, it must hold the legislation constitutional." State ex rel. Strykowski v. Wilkie,81 Wis.2d 491, 506, 261 N.W.2d 434 (1978). Therefore, the rational basis test is not limited to tort classifications based on the private versus public sector distinction. *Page 191 
In my opinion, therefore, the Act does not deny equal protection to the injured plaintiff. The private nature of the Foundation and the theoretic availability of liability insurance, even if they raised public purpose concerns, do not create equal protection infirmities. What counts is the rationality of successfully achieving a state program of historic circus enrichment by attracting qualified personnel to serve under separate tort procedures and rules, especially when raced with the alternative of high liability insurance costs.
These considerations also dispose of the second prong of the equal protection attack, that nothing distinguishes the Foundation from other similar entities serving state government. The Legislature rationally might have found that the Foundation uniquely serves the state in a high risk, high cost liability area and that the jeopardy to citizen historic circus appreciation is unacceptable as a matter of policy, either because of necessary pass-through of insurance costs to ticket purchasers, or the feared reduction of programs, or the anticipated loss of quality from cut backs in other areas. The rational basis test applies even to classifications among different governmental units. The Legislature "`"may address itself to only that phase of a problem that appears most acute" . . . even if the net result resembles a crazy quilt more than a carefully balanced sculpture.'" Sambs, 97 Wis.2d at 378
n. 13.
For the foregoing reasons I believe the Act is constitutional.
BCL:CDH
[1] Obviously neither the Foundation nor the Society should agree to any modification to the present relationship, including amendments to the Foundation's bylaws without the approval of the attorney general. To do so imperils indemnity of judgments. Of course, neither my approval of the modification nor this opinion on the validity or the Act binds the courts. A court declaration of invalidity would instate the peril. While the Legislature thereafter might hold individuals harmless as a matter of discretion, the affected individuals should understand such result is a matter or grace, not right. *Page 192