FRANK A. MEYERS, Division of Criminal Investigation, Departmentof Justice
You have requested an opinion upon the question of whether a wholesaler of fermented malt beverages, who is licensed pursuant to sec. 66.054 (6), Stats., may also obtain a retail Class "B" license under sec. 66.054 (8), Stats., without violating the tied-house provisions of sec. 66.054 (4) (a), Stats.
This office has previously ruled on a similar question. See 22 OAG 503 (1933), which answered in the negative the question of whether under ch. 207, Laws of 1933, a fermented malt beverage wholesaler's license and a fermented malt beverage Class "B" retail license could be issued to the same person.
Since that 1933 opinion, the legislature has amended the statute that was the subject of that opinion. The question, therefore, becomes, as amended and as renumbered to sec. 66.054 (4) (a), Stats., does the statute now dictate a conclusion different from that contained in the 1933 opinion. The answer is in the negative.
Section 66.054 (4) (a), Stats., provides in part as follows:
"66.054 (4) RESTRICTIONS ON BREWERS, BOTTLERS AND WHOLESALERS. (a) No brewer, bottler or wholesaler shall furnish, give, lend, lease or sell any furniture, fixtures, fittings, equipment, money or other thing of value, directly or indirectly, or through a subsidiary or affiliate corporation, or by any officer, director, stockholder or partner thereof, to any Class "B" licensee, or to any person for the use, benefit or relief of any Class "B" licensee, or guarantee the repayment of any loan, or the fulfillment of any financial obligation of any Class "B" licensee . . ." *Page 69 
This statutory provision (as well as its predecessor as originally found in ch. 207, Laws of 1933) was designed to prevent the so-called "tied-house" relationships in the fermented malt beverage industry in the state of Wisconsin. The tied-house is a retail fermented malt beverage outlet in which a brewer, bottler or wholesaler of fermented malt beverages has a managerial interest or control. One of the outstanding features which characterizes the development of state laws in the post-prohibition era was abolition of the tied-house system. A 1960 study reports that 34 states have statutes related to tied-house regulations. See Alcoholic Beverage Control, an official study by the Joint Committee of the States to Study Alcoholic Beverage Laws (1960), at page 35. This office has previously recognized that the 1933 Legislature endeavored to correct one of the evils of the pre-prohibition days, namely, the tied-house relationship. See 22 OAG 814 (1933).
Careful review of sec. 66.054, Stats., indicates that the legislature clearly intended that the fermented malt beverage industry should be divided into three levels: the manufacturer, the distributor and the retailer. Recognizing that there should be three levels in the fermented malt beverage industry, the legislature realized that a potential existed for abuses to this concept and, therefore, created the tied-house prohibitions found in sec. 66.054 (4) (a), Stats. As this office said in an informal opinion on July 25, 1961:
"The object and intent of sec. 176.17 (as well as 66.054 (4) relating to fermented malt beverage) is to prevent manufacturers and wholesalers from acquiring complete or partial control of specific Class "B" retailers, directly by owning them or indirectly by creating financial or moral obligations. The purpose is clearly to assure the freest competition in the industry by preventing monopolistic practices and, to divorce entirely the wholesaler from the Class "B" retailer."
Section 66.054 (4) (a), Stats., contains language which must be construed to include the prohibition of ownership of a retail Class "B" fermented malt beverage establishment by a fermented malt beverage wholesaler. A wholesaler is prohibited from giving money or any other thing of value to any Class "B" licensee. He is also prohibited from lending any money or other thing of value *Page 70 
directly or indirectly to a Class "B" licensee. He is prohibited from guaranteeing the repayment of any loan or the fulfillment of any financial obligation of any Class "B" licensee. Therefore, the wholesaler is prohibited from providing whatever money or capital is necessary for the establishment of Class "B" licensed premises.
A wholesaler is prohibited from furnishing anything of value to a Class "B" retailer. "Furnished" is a very broad term which includes instances of mutual consideration as well as gratuity. 44 OAG 91, 92 (1955). Another portion of sec. 66.054 (4), Stats., provides that a wholesaler cannot provide anything of value ". . . to any person for the use, benefit, or relief of any Class "B" licensee . . ." A wholesaler who obtains a Class "B" retail license does so for the "benefit" of a Class "B" licensee since the obtaining establishes the retailer's existence.
If one were to read sec. 66.054 (4) (a), Stats., as allowing for ownership of a Class "B" retail establishment by a wholesaler, absurd results would occur. Such a reading would produce a situation in which a wholesaler could not own the bar stools or beer glasses but could hold the retail license. This interpretation produces an absurd result given the evil the legislature intended to prohibit. "The rule is that if a statute is reasonably open to any other construction it will not be given a construction which results in unreasonableness." Williams v.City of Madison (1962), 15 Wis.2d 430, 439, 113 N.W.2d 395. Absurd results are to be avoided, if possible, in construing statutes. State v. Fischer (1962), 17 Wis.2d 141, 146,115 N.W.2d 553.
This office has previously ruled that brewers, bottlers and wholesalers may not provide a Class "B" retailer with certain forms of refrigerating units to be used on the retail Class "B" licensed premises. See 40 OAG 84 (1951). This office has previously ruled that for a brewer, bottler or wholesaler to furnish, give, lend money or anything of value to a trade association comprised of holders of Class "B" licenses is prohibited by sec. 66.054 (4) (a), Stats. See 44 OAG 34 (1955). This office has also issued an opinion that the purchase by a brewer, bottler or wholesaler of advertising space in publications published by a trade association comprised of Class "B" fermented malt beverage licensees, or the purchase of display or *Page 71 
other rental space from such an association, constitutes the furnishing of money and is, therefore, prohibited by sec. 66.054 (4) (a), Stats. See 44 OAG 91 (1955). It would be absurd to conclude that the forms of tied-house relationships referred to above are in violation of sec. 66.054 (4) (a), Stats., while concluding that it was not the legislative intent to prohibit wholesalers from having retail Class "B" licenses issued to them. The legislature cannot be assumed to have intended such anomalous results unless no other reasonable construction can prevail.State ex rel. McManman v. Thomas (1912), 150 Wis. 190, 196,136 N.W. 623. To allow the wholesaler to obtain a Class "B" license would be an absurdity in view of the clear legislative purpose of sec. 66.054 (4), Stats., and such avoidance of legislative intent should not be countenanced. 48 C.J.S. Intoxicating Liquor, sec. 191.
In construing the statute, great consideration should be given to the object sought to be accomplished by the statute. Huck v.Chicago, St. P., M. O. R. Co. (1958), 4 Wis.2d 132, 137,90 N.W.2d 154. Clearly the legislative intent of sec. 66.054 (4) (a), Stats., is to prevent the tied-house relationship between the retailer and either the brewer or the wholesaler. In addition, in construing the statute, one must derive the intent of that statute from the act as a whole. Smith v. City ofBrookfield (1956), 272 Wis. 1, 5, 74 N.W.2d 770. The intent of sec. 66.054 (4), Stats., when read as a whole is to prevent a tied-house relationship existing between the wholesaler and retailer, including the possibility of the wholesaler also being a Class "B" licensee. A Wisconsin Supreme Court statement inBeckman v. Bemis-Hooper-Hayes Co. (1933), 212 Wis. 565, 571,250 N.W. 420 is instructive:
"The statute is to be examined first to discover the legislative purpose, and when that purpose is discovered it is to be so construed as to effect the evident purpose of the legislature if the language admits of that construction."
What is of fundamental importance is not what is included but what is omitted from sec. 66.054, Stats. Nowhere is the wholesaler explicitly granted the privilege of holding both a wholesale and a retail license. Laws dealing with alcoholic beverages are strictly construed against the licensee and it is not *Page 72 
possible to extend such a law by implication. 38 OAG 540, 541 (1949). "The prohibition provision (of sec. 66.054 (4) (a), Stats.) is a sweeping, all-inclusive one, subject only to the specific exceptions set forth." 40 OAG 84, 85 (1951). These exceptions which limit the scope of the enacting clause must be strictly construed. Sutherland Statutory Construction, (3rd Ed. 1943) sec. 4830, p. 377. In 22 OAG 503 (1933), this office offered an opinion which indicated that a wholesaler could not be issued a Class "B" retailer's license. This opinion was based on sec. 66.05 (10) (c) 1, Stats., enacted by ch 207, Laws of 1933. This provision read:
"(c) Restrictions on brewers, bottlers and wholesalers. 1. No brewer, bottler, wholesaler, or corporation a majority of whose stock is owned by any brewer, bottler or wholesaler, shall supply. furnish, lease, give, pay for, or take any chattel mortgage on any furniture, fixtures, fittings or equipment used in or about any place which shall require a Class "B" license except as provided in subdivision 2 of this paragraph, nor shall any brewer, bottler, wholesaler or corporation a majority of whose stock is owned by any brewer, bottler, or wholesaler, lease any real estate acquired after the effective date of this subsection to any person, for the purpose of conducting therein any business requiring a Class "B" license, but this prohibition as to leasing of real estate shall not apply to a hotel, or to a restaurant not a part of or located in or upon the premises of any mercantile establishment, or to a bona fide club, society or lodge that shall have been in existence for not less than six months prior to the date of granting such license. No brewer, bottler or wholesaler shall advance, pay or furnish money for any license fees or taxes which may be required to be paid by any retailer or be otherwise financially interested in, directly, orindirectly, in any Class "B" license, except as provided in subdivision 2 of this paragraph. Any licensee who shall be a party to any violation of this subdivision or who shall receive the benefits thereof shall be equally guilty of a violation of the provisions thereof." (Emphasis added)
Said subdivision 2 of sec. 66.05 (10) (c), Stats., provided in part: *Page 73 
"A brewer may maintain and operate in and upon the brewery premises a place for the service or sale of fermented malt beverages or light wines, for which a class "B" license shall be required."
In 22 OAG 814 (1933), this office issued an opinion which held that the above quoted statute did not contain a prohibition against stockholders, directors or officers of a corporation whose business was that of a brewer from doing any of the prohibited acts found in the above-quoted statute. This opinion also raised some questions as to the efficacy of the prohibitions found in this above-quoted statute in reference to the corporations involved in the brewery, bottling or wholesale business.
Section 66.05 (10) (c) 1, Stats., ch. 207, Laws of 1933, was repealed and recreated by ch. 121 of the Laws of 1941. A reading of that provision would indicate the principal concern of the legislature was to broaden the scope of the tied-house prohibitions so as to eliminate the loopholes that had been created by the original language of the tied-house laws. Section 66.05 (10) (c) 1, Stats., ch. 121, Laws of 1941, read in part:
"No brewer, bottler or wholesaler shall furnish, give or lend any money or other thing of value, other than consumable merchandise intended for resale, including the containers thereof, nor furnish, give, lend, lease or sell any furniture, fixtures, fittings or equipment, directly or indirectly, or through a subsidiary or affiliate corporation, or by any officer, director, stockholder or partner thereof, to any Class "B" licensee, or to any person for the use, benefit or relief of any Class "B" licensee, or guarantee the repayment of any loan or the fulfillment of any financial obligation of any Class "B" licensee. . . ."
This provision now renumbered sec. 66.054 (4) (a), Stats., remains substantially unchanged as of this date. Removal by the 1941 Legislature of the phrase ". . . or be otherwise interested in, directly or indirectly . . ." previously found in sec. 66.054 (10) (c) 1, Stats., as enacted in 1933, did not affect the application of the law to our current question. Legislative intent clearly had not changed. The legislature broadened the scope of the prohibitions of the fermented malt beverage tied-house law in its 1941 legislation. Those prohibitions remain essentially unchanged *Page 74 
through today. Again, it would be absurd to read the change in legislative language found in the 1941 statute to mean that while stockholders, partners and directors or corporations which were brewers, bottlers or wholesalers could not own the bar stools or beer glasses of a Class "B" licensee, they could, in fact, hold the license itself. This absurd interpretation is clearly not the legislative intent.
The most reasonable and consistent construction of sec. 66.054 (4) (a), Stats., is that a fermented malt beverage wholesaler cannot own any interest, directly or indirectly, in any Class "B" retail fermented malt beverage license: Such an opinion is derived from the legislative intent backing sec. 66.054 (4) (a), Stats., as derived from the scope, history, context subject matter, and objects intended to be remedied and accomplished in enacting the fermented malt beverage tied-house law.
RWW:PAP