MILLER BRANDS-MILWAUKEE, INC., a Wisconsin corporation, Plaintiff-Respondent,†

v.

Karen A. CASE, Secretary of the Wisconsin Department of Revenue, and all Department Agents and Employees, Defendants-Appellants.

Court of Appeals

*No. 89–0984. Orally argued December 14, 1989.—Decided May 31, 1990.*

(Also reported in 457 N.W.2d 896.)

†Petition to review granted.

For the defendants-appellants the cause was submitted on the briefs of *Donald J. Hanaway,* attorney

general, and *Gerald S. Wilcox,* assistant attorney general, and oral argument by *Gerald S. Wilcox.*

For the plaintiff-respondent the cause was submitted on the brief of *James M. Shellow* and *Robert R. Henak* of *Shellow, Shellow & Glynn, S.C.* of Milwaukee and *Howard S. Goldman* of *Tomlinson, Gillman, Travers & Gregg, S.C.* of Madison, and oral argument by *James M. Shellow.*

Before Eich, C.J., Dykman and Sundby, JJ.

DYKMAN, J. The Department of Revenue (DOR) appeals from a summary judgment declaring that trade spending,[1] as defined by Miller Brands-Milwaukee, Inc., does not violate Wisconsin's tied-house law, sec. 125.33(1)(a), Stats. We address four issues: (1) whether the affidavit supporting Miller's motion contains sufficient evidentiary facts for summary judgment, (2) whether this is a proper case for declaratory judgment, (3) whether sec. 125.33(1)(a) prohibits trade spending, and (4) if so, whether the statute unconstitutionally prohibits trade spending.

We conclude that the factual allegations contained in the affidavit are sufficient and that declaratory relief is proper. We also conclude that trade spending violates

---

[1]In his affidavit supporting the motion for summary judgment, Miller's attorney stated that:

"Trade spending" consists of the practice whereby sales people or other employees of a beer wholesaler purchase beverages for customers at Class "B" licensed retail premises. The price paid for the beverages is the price charged to the public by the retailer. Although customers are encouraged to sample products distributed by the wholesaler, the offer to purchase is not withdrawn if the customer chooses a different drink.

In this opinion, we will use the term "trade spending" to refer to the practice described in this footnote.

sec. 125.33(1)(a), Stats., and that the statute survives Miller's constitutional challenges. Accordingly, we reverse.

## BACKGROUND

Miller is a wholesaler of fermented malt beverages in Wisconsin subject to ch. 125, Stats. It sells its products to retailers holding Class "B" licenses under sec. 125.26. DOR is responsible for investigating possible violations of ch. 125. Sec. 125.145.

In February 1988, a DOR special agent met with Miller's attorneys and told them that the department had received a complaint that Miller had violated sec. 125.33(1)(a), Stats., by engaging in trade spending and that he had been authorized to investigate that complaint.

Miller then sought declaratory relief under sec. 806.04, Stats., requesting that the court determine whether trade spending violates sec. 125.33(1)(a), Stats., and, if so, whether the statute unconstitutionally prohibits trade spending. Miller moved for summary judgment. The court granted the motion, declaring that trade spending did not violate sec. 125.33(1)(a).

## SUFFICIENCY OF THE AFFIDAVIT

DOR contends that the affidavit supporting Miller's motion for summary judgment is insufficient. The affidavit was made by Miller's attorney. Where, as here, a party is a corporation, counsel may make the affidavit on behalf of his corporate client. *Kroske v. Anaconda American Brass Co.,* 70 Wis. 2d 632, 641–42, 235 N.W.2d 283, 287 (1975).

DOR argues that Miller's affidavit cannot support the motion for summary judgment because it does not contain sufficient evidentiary facts. Affidavits in support of a motion for summary judgment must contain evidentiary facts. *Hopper v. Madison,* 79 Wis. 2d 120, 130, 256 N.W.2d 139, 143 (1977). We disregard those portions of the affidavits that contain allegations of ultimate facts or conclusions of law. *Id.* We agree with DOR that the affidavit does contain allegations of ultimate fact and conclusions of law. We will disregard those portions of the affidavit.[2]

The remaining portions of the affidavit contain allegations of material evidentiary facts. First, the affidavit alleges that, at a meeting between a DOR special agent and Miller's attorneys, the agent informed Miller that:

> [T]he Department of Revenue had received a complaint that Miller Brands-Milwaukee, Inc. had engaged in trade spending and thereby had violated the provisions of Wis. Stat. sec. 125.33(1) and that [the agent] had been authorized by the Department to investigate these alleged violations . . ..

Second, the affidavit states that " 'Trade spending' consists of the practice whereby sales people or other

---

[2]We disregard the following in the affidavit as either an allegation of ultimate fact or a conclusion of law:

 h. The purpose of trade spending is to convince the customers of the licensed retail premises to sample products distributed by the wholesaler and to switch their preference to the wholesaler's brand.

 . . ..

 j. A wholesaler's trade spending on retail premises promotes business competition and does not subject the retailer to control by the wholesaler.

 k. A wholesaler's trade spending on retail premises does not violate Wis. Stat. sec. 125.33(1)(a).

employees of a beer wholesaler purchase beverages for customers at Class "B" licensed retail premises." Finally, the affidavit observes that "the price paid for the beverages is the price charged to the public by the retailer. Although customers are encouraged to sample products distributed by the wholesaler, the offer to purchase is not withdrawn if the customer chooses a different drink."

We understand from this affidavit that Miller has engaged in the practice of trade spending—*i.e.*, its sales agents or employees have purchased beverages for customers of Class "B" retailers—and that the department sought to investigate the practice to determine whether it violated sec. 125.33(1)(a), Stats.

DOR submitted no affidavits in opposition to the motion for summary judgment. Because DOR submitted no counter-affidavits, we must accept the evidentiary facts in Miller's affidavit as uncontroverted. *Jones v. Sears Roebuck & Co.*, 80 Wis. 2d 321, 326, 259 N.W.2d 70, 72 (1977).

## DECLARATORY JUDGMENT

We next consider whether the issues presented are ripe for declaratory relief. Declaratory relief cannot be granted absent a justiciable controversy. *Loy v. Bunderson*, 107 Wis. 2d 400, 410, 320 N.W.2d 175, 182 (1982); sec. 806.04, Stats. To be justiciable, the issue involved in the controversy must be ripe for judicial determination, among other things. *Loy*, 107 Wis. 2d at 410, 320 N.W.2d at 182. A matter is not ripe for declaratory relief unless the declaration "is conclusive upon the controversy submitted to the court." *Id.* at 411, 320 N.W.2d at 182. " 'It is not a judicial function' to declare rights based on 'issues that are fictitious, colorable, or hypothetical.' "

*Sipl v. Sentry Indemnity Co.,* 146 Wis. 2d 459, 466-67, 431 N.W.2d 685, 688 (Ct. App. 1988) (quoting E. Borchard, Declaratory Judgments 84-85 (2nd ed. 1941)).

DOR argues that the issues presented are not ripe for judicial determination because insufficient facts exist regarding the nature and scope of Miller's trade spending activities. Our response to this issue depends on how we interpret sec. 125.33(1)(a), Stats. *Cf. Town of Walworth v. Fontana-on-Geneva Lake,* 85 Wis. 2d 432, 440, 270 N.W.2d 442, 446 (Ct. App. 1978) (holding that plaintiff stated cause of action because, under one interpretation of the statute, the plaintiff would be entitled to declaratory relief).

We conclude below that sec. 125.33(1)(a), Stats., prohibits trade spending. A violation of the statute is not dependent on the amount of money a wholesaler spends or on the number of beverages it buys. The uncontroverted facts show that Miller's sales agents or employees have purchased beverages for customers of Class "B" retailers. In light of our interpretation of sec. 125.33(1)(a), we conclude that the affidavit provides enough facts regarding Miller's trade spending practice that we can apply the statute.

DOR also argues that declaratory judgment is not proper because no prosecution is pending against Miller. *See* secs. 125.33 and 125.11, Stats. (Wholesalers may be prosecuted for violations of sec. 125.33(1)(a), Stats.). DOR says that it has only sought to investigate Miller's potential violation of ch. 125 and that it might not take further action.[3] Though no prosecution is pending,

---

[3]Section 125.145, Stats., provides:

> Upon request by the secretary of revenue, the attorney general may represent this state or assist a district attorney in prosecuting any case arising under this chapter.

Miller is a potential defendant and need not wait to be prosecuted before seeking declaratory relief. "Potential defendants may seek a construction of a statute or a test of its constitutional validity." *State ex rel. Lynch v. Conta,* 71 Wis. 2d 662, 674, 239 N.W.2d 313, 325 (1976).

## APPLICATION OF SEC. 125.33(1)(a), STATS.

■This case involves the application of sec. 125.33(1)(a), Stats.,[4] to the uncontroverted facts contained in the affidavit supporting Miller's motion for summary judgment. The application of a statute to a set of facts presents a question of law, which we review *de novo. Burlington Northern R. v. Superior,* 153 Wis. 2d 206, 208, 450 N.W.2d 486, 487 (Ct. App. 1989).

■The purpose of statutory interpretation is to give effect to the intent of the legislature. To determine legislative intent, we look first to the language of the statute itself. *State v. Pham,* 137 Wis. 2d 31, 34, 403 N.W.2d 35, 36 (1987). If the statutory language is clear and unambiguous, we interpret that language according to its ordinary meaning. *State v. Trongeau,* 135 Wis. 2d 188, 191,

---

Section 139.08(3), Stats., grants DOR all necessary police powers to prevent violations of ch. 125.

[4]Section 125.33(1)(a), Stats., provides:

> Except as provided in this section, s. 125.28(2) or 125.31(1), no brewer or wholesaler may furnish, give, lend, lease or sell any furniture, fixtures, fittings, equipment, money or other thing of value to any campus or Class "B" licensee or permittee, or to any person for the use, benefit or relief of any campus or Class "B" licensee or permittee, or guarantee the repayment of any loan or the fulfillment of any financial obligation of any campus or Class "B" licensee or permittee. Such actions may not be taken by the brewer or wholesaler directly or indirectly, or through a subsidiary or affiliate corporation, or by any officer, director, stockholder or partner thereof.

400 N.W.2d 12, 13 (Ct. App. 1986). If the language is unclear or ambiguous, we look to the legislative history, context, subject matter, or object of the statute to ascertain legislative intent. *Pham,* 137 Wis. 2d at 34, 403 N.W.2d at 36.

Section 125.33(1)(a), Stats., provides in part:

> [N]o brewer or wholesaler may furnish, give, lend, lease or sell any . . . thing of value to any . . . Class "B" licensee or permittee, or to any person for the use, benefit or relief of any . . . Class "B" licensee or permittee . . . .. Such actions may not be taken by the brewer or wholesaler directly or indirectly . . . ..

The object of Wisconsin's tied-house law is:

> [T]o prevent manufacturers and wholesalers from acquiring complete or partial control of specific Class "B" retailers, directly by owning them or indirectly by creating financial or moral obligations. The purpose is clearly to assure the freest competition in the industry by preventing monopolistic practices and, to divorce entirely the wholesaler from the Class "B" retailer.

61 Op. Att'y Gen. 68, 69 (1972).

At issue is the meaning of "thing of value." We conclude the term is unambiguous. Reasonable people could not disagree as to the meaning of "thing of value." *See Sturgis v. Neenah Board of Canvassers,* 153 Wis. 2d 193, 198, 450 N.W.2d 481, 483 (Ct. App. 1989) (statute is ambiguous if reasonably well-informed person would understand it in more than one way). When a wholesaler's sales agents or employees buy beverages for a retailer's customers, the wholesaler is giving the retailer a thing of value within the meaning of the statute. The profit the retailer earns and the good will generated by

811

the wholesaler's trade spending are things of value. Trade spending violates sec. 125.33(1)(a), Stats., regardless of the scope of the wholesaler's trade spending activities. The statute does not require a showing that the wholesaler·will have control over the retailer by virtue of its trade spending activities.

The dissent adopts a position recently rejected in *Girouard v. Jackson Circuit Ct.,* 155 Wis. 2d 148, 454 N.W.2d 792 (1990). In that case, the supreme court explained that we are not to look beyond the language of an unambiguous statute. *Id.* at 155–56, 454 N.W.2d at 795. By first considering the evils of "tied houses," the dissent does what *Girouard* prohibits. Had the dissent first examined the statute, the legislature's intent to prohibit all forms of gratuitous transfer would become apparent.[5] For instance, "money" may not be given or lent. Money comes in various denominations, starting at one cent. Were we to accept the dissent's analysis, the legislature would be unable to strictly regulate any business—the more all inclusive the statutory language became, the greater the likelihood that a court would interpret the statute as not meaning what it says.

It is difficult to imagine a gratuitous transfer not prohibited by sec. 125.33(1)(a), Stats. However, we are not required to list all possible transfers covered by the statute. When, and if, further cases arise, we will determine whether sec. 125.33(1)(a) applies to a new fact situation.

---

[5]Titles are not part of statutes. Sec. 990.001(6), Stats. Neither we nor the dissent is permitted to consider a statute's title in determining whether the statute is ambiguous. *Hemerley v. American Fam. Mut. Ins. Co.,* 127 Wis. 2d 304, 307, 379 N.W.2d 860, 862 (Ct. App. 1985).

An opinion of the attorney general supports our interpretation.[6] Well-reasoned attorney general's opinions have persuasive value when a court later addresses the meaning of the same statute. *Town of Vernon v. Waukesha County,* 102 Wis. 2d 686, 692, 307 N.W.2d 227, 230 (1981). According to the attorney general, sec. 125.33(1)(a), Stats., is clear and unambiguous. 77 Op. Att'y. Gen. 76, 77 (1988). The attorney general determined that the statute prohibits a director, officer or stockholder of a brewery to have an interest in real estate leased to a Class "B" licensee. In reaching its conclusion, the attorney general said:

> Proof regarding a violation of 125.33(1)(a) does not require an actual showing of influence by a brewer or wholesaler upon the product choices of a retailer. Tied-house laws are specifically designed to alleviate the need for such a showing. That is why the Legislature broadly chose to bar the described relationships whether they exist directly or indirectly.

77 Op. Att'y Gen. at 79–80.

The attorney general gave a different interpretation of an earlier version of the statute in a 1979 opinion. There, the attorney general concluded that "thing of value" was ambiguous. 68 Op. Att'y Gen. 395, 396 (1979). The attorney general determined that a brewer did not violate sec. 66.054(4)(a), Stats. (1979–80),[7] by

---

[6]DOR argues that we should consider the attorney general's opinions as the agency's interpretation of the statute because the attorney general is charged with prosecuting violations of ch. 125, Stats. We know of no case law that requires us to do so.

[7]Section 66.054(4)(a), Stats. (1979–80), provided in part:

> No brewer, bottler, or wholesaler shall furnish, give, lend, lease or sell any . . . thing of value, directly or indirectly . . . to any Class "B"

sponsoring a bowling tournament held on the premises of a Class "B" retailer. According to the attorney general, "a temporary increase in business or good will" was not a thing of value within the meaning of the statute. 68 Op. Att'y Gen. at 396. Any benefit flowing to the retailer would be too remote to fall within the statute's proscriptions. *Id.* No violation would occur because the brewer was not attempting "to buy or control a Class 'B' retailer or to create a financial or moral obligation that would facilitate control by the brewer." *Id.*

We do not consider the 1979 opinion persuasive. Section 125.33(1)(a), Stats., does not require that the wholesaler's prohibited activities constitute an attempt on its part to gain control over the retailer.

## CONSTITUTIONALITY OF SEC. 125.33(1)(a), STATS.

Miller argues that, if sec. 125.33(1)(a), Stats., prohibits trade spending, it is unconstitutional because (1) it constitutes an unreasonable exercise of the state's police power; (2) it is void for vagueness; and (3) it violates Miller's commercial speech rights.

■■■■

Statutes are presumptively constitutional. *State v. Kay Distributing Co., Inc.,* 110 Wis. 2d 29, 33, 327 N.W.2d 188, 191 (Ct. App. 1982). One challenging the constitutionality of a statute must prove unconstitutionality beyond a reasonable doubt. *Id.* at 29, 327 N.W.2d at 191–92. Whether a statute is unconstitutional is a question of law, which we determine without deference to the trial court. *Id.*

1. Reasonable Exercise of Police Power.

licensee, or to any person for the use, benefit or relief of any Class "B" licensee . . ..

Miller argues that sec. 125.33(1)(a), Stats., is unreasonable and therefore unconstitutional to the extent that it prohibits trade spending. We disagree.

The state has broad police power to regulate the liquor industry. *Moedern v. McGinnis,* 70 Wis. 2d 1056, 1068, 236 N.W.2d 240, 246 (1975). Accordingly, we will uphold as constitutional any reasonable and rational statute enacted under that power. *Id.*

A rational basis exists for the prohibition of trade spending under sec. 125.33(1)(a), Stats. The object of the statute is to prevent wholesalers from gaining control over retailers. A wholesaler could gain such control through trade spending. The prohibition against trade spending reasonably furthers the statute's legitimate goal of deterring a wholesaler's monopolistic control over the liquor market.

2. Void for Vagueness.

Miller argues that sec. 125.33(1)(a), Stats., is unconstitutionally vague under Wis. Const. art. I, sec. 3 because "thing of value" is ambiguous and undefined. We disagree.

A criminal statute is void for vagueness if it "fails to afford proper notice of the conduct it seeks to proscribe, or if it encourages arbitrary or erratic arrests and convictions." *Kay,* 110 Wis. 2d at 33-34, 327 N.W.2d at 192. A statute is vague if it is "so obscure that persons of ordinary intelligence must necessarily guess as to its meaning and differ as to its application." *Id.* at 34, 327 N.W.2d at 192.

We conclude above that "thing of value" is not ambiguous. Although "thing of value" is not defined in

the statute, that fact does not render the statute vague. Because "thing of value" is unambiguous, its ordinary meaning can be established by its dictionary definition. *Thiensville Village v. DNR,* 130 Wis. 2d 276, 283, 386 N.W.2d 519, 522 (Ct. App. 1986). *Webster's Third New International Dictionary,* 2530 (1976), defines "value" as "1 a: the amount of a commodity, service, or medium of exchange that is the equivalent of something else: a fair return in goods, services, or money" and "2: the monetary worth of something: marketable price usu. in terms of a medium of exchange." The term "thing of value" is not so inherently vague that a person of ordinary intelligence would not understand its meaning. We conclude, therefore, that sec. 125.33(1)(a), Stats., is not unconstitutionally vague.

3. Commercial Speech.

Miller argues that the prohibition on trade spending violates its commercial speech rights under art. I, sec. 3 of the Wisconsin Constitution. Miller contends that trade spending is advertising and that as such it is a form of commercial speech protected by art. I, sec. 3 of the Wisconsin Constitution. *See Central Hudson Gas v. Public Service Comm'n,* 447 U.S. 557, 561 (1980) (first amendment protects commercial speech from unwarranted regulation).

If trade spending is advertising, then it is advertising purchased from Class "B" retailers. Purchasing advertising from Class "B" retailers is prohibited under sec. 125.33(1), Stats.[8] A state may prohibit wholesalers from buying advertising from retailers without offending

[8]*But see* sec. 125.33(2)(g), Stats., which provides a limited exception for Class "B" licensees or permittees who are members of a professional athletic league.

the first amendment of the United States Constitution. *Actmedia, Inc. v. Stroh,* 830 F.2d 957, 964–968 (9th Cir. 1986). Miller does not argue that Wis. Const. art. I, sec. 3 affords greater protection to commercial speech than the first amendment. Therefore, we conclude that, under the state constitution, the state may prohibit wholesalers from buying advertising from Class "B" retailers.

*By the Court.*—Judgment reversed.

EICH, C.J. *(dissenting).* I agree with the majority that the affidavit supporting Miller's motion contains sufficient evidentiary facts, and that the case is ripe for declaratory judgment. I also agree that sec. 125.33(1)(a), Stats., is constitutional. My disagreement is with the majority's conclusion that Miller's activities as revealed by this record run afoul of the statute.

Considering the language of sec. 125.33(1)(a), Stats., in its entirety, I cannot accept the majority's conclusion that the phrase "thing of value" is plain and unambiguous. Were it so—were it as plain as the majority believes—almost any object of any size or nature, whether worth thousands or having the minimal value of a stick of gum or a matchbook, would, if given by a brewer or wholesaler to a retail customer, invoke the prohibitions and penalties of the statute. I believe such an interpretation does violence to the statute's language and purpose.

Looking to the statute itself, the language immediately preceding the phrase "or other thing of value," speaks of "furniture, fixtures, fittings, equipment [or] money," and the following language refers to guarantees of loans and fulfillment of the retailer's financial obligations.

The majority opinion, while concluding that the phrase is "unambiguous," does not undertake to state

what it believes the phrase means. If purchasing a beverage—a beer, or perhaps a soda—for a retailer's customer is a thing of value to the retailer within the statute's purview, what about a stick of gum? A handful of peanuts? Given the title of the statute—it is stated to be a law placing restrictions on "dealings between brewers, wholesalers and retailers"—and its references to the former furnishing to the latter things such as furniture, equipment, money, relief from financial obligations or other forms of credit—leads me to conclude that, considered in context and in light of the purpose of the law as this court and others have described it, the phrase "thing of value" is reasonably capable of different interpretations. And many of those interpretations—including, in my opinion, the interpretation implemented by the majority in this case—have little to do with the evils the statute was enacted to counter.

Laws such as sec. 125.33(1)(a), Stats., exist to prevent "tied houses," which we have characterized as "an evil . . . formerly prevalent in the liquor industry," where "large liquor interests . . . exert[ed] control over liquor retailers" to the extent of monopolizing them. *State v. Black Steer Steak House, Inc.,* 102 Wis. 2d 534, 537, 307 N.W.2d 328, 330 (Ct. App. 1981). Tied-house laws "are aimed at preventing the integration of manufacturing, wholesale, warehouse, and retail outlets in the liquor industry," in order to avoid the anti-competitive, monopolistic effects of "concentrati[ng] . . . liquor retailing in the hands of economically powerful [brewery and wholesaling] interests." *Wis. Wine & Spirit Institute v. Ley,* 141 Wis. 2d 958, 965, 416 N.W.2d 914, 917 (Ct. App. 1987). And they attempt to bar such monopolistic, anti-competitive practices by "keep[ing] the different levels of the liquor industry separate" and by prohibiting brewers and wholesalers from offering "financial

inducement[s]" such as the extension of credit and other inducements which can "lead to monopolistic control." *Black Steer Steak House,* 102 Wis. 2d at 537, 307 N.W.2d at 330.

Tied-house laws are common in the United States. The Illinois Supreme Court, commenting on that state's version, discussed its purpose as follows:

> [The statute] was intended to remedy a competitive abuse in the beer industry referred to as the "tied house." By the granting of gifts and loaning of money to retailers, distributors could effectively "tie" themselves to retailers to the point of excluding all competitors. This form of vertical integration between beer distributing and retailing allowed the distributor to exercise almost complete control over the retailers. *T. Sharpenter, Inc. v. Liquor Control Com'n,* 518 N.E.2d 128, 130–31 (Ill. 1987).

Given the purpose of tied-house laws, I agree with the analysis of Wisconsin's attorney general, who concluded in a 1979 opinion that the language of a predecessor statute containing the same language as sec. 125.33(1)(a), Stats., was "ambiguous as to the meaning of 'thing of value.'" 68 Op. Att'y Gen. 395, 396 (1979). The opinion goes on to quote an earlier opinion:

> The object and intent of [the statute] is to prevent manufacturers and wholesalers from acquiring complete or partial control of specific class B retailers, directly by owning them or *indirectly by creating financial or moral obligations.* (Emphasis in original.)

Then, citing the "well-settled principle of statutory construction that statutes enacted as a legitimate exercise of the police power ought not be given a construction that is 'unnecessary to the furtherance of the main

819

purpose of the statute,' " the attorney general noted that, with respect to the fact situation presented—a brewer's sponsorship of a bowling tournament in an establishment holding a Class B license—there was no indication of any "attempt by a brewer to buy or control a . . . retailer or to create a financial or moral obligation that would facilitate control by the brewer." *Id.* at 396. The attorney general concluded: "On the basis of the facts before me the benefit, if any, enjoyed by . . . retailers that participate in the bowling tournament, would be entirely too speculative and remote to constitute a violation of [the statute, and] the proposed promotion also lacks any of the evil that [the statute] was designed to control." *Id.* at 397.

Several courts have taken similar positions. In *National Distributing Co. v. U.S. Treasury Dept.,* 626 F.2d 997, 1004 (D.C. Cir. 1980), the court considered whether the furnishing of wine to retailers below the wholesaler's cost was a "thing of value" within the meaning of a tied-house law. Concluding that it was not, the court first noted that that "primary purpose" of the law was to prevent "a form of vertical integration whereby wholesalers . . . might gain effective control of . . . independent retail outlets." It went on to state:

> In the absence of any indication that [the] price cut had the purpose or effect of gaining control over retail outlets . . . we doubt whether the Act can have any application.
>
> We acknowledge that, taken by itself, the phrase "giving . . . or selling . . . other thing[s] of value" is broad enough to include below-cost sales. But ordinary sales at or above cost must also be considered "giving . . . or selling . . . other thing[s] of value": clearly an absurd result . . . .. Applying ordinary principles of statutory construction, we must read the

phrase . . . in the light of the many specific enumerated examples in the text. Financing the license, property, or other capital assets of the retailer, or furnishing equipment, fixtures, signs, supplies, or advertising . . . all involve a *link* or *tie* between the wholesaler or producer and the retailer. In contrast, a nondiscriminatory, unconditional low-priced sale such as in this case is a single, contained transaction; it involves no link or tie between the parties . . .. *Id.* at 1004 (emphasis in original; footnote omitted).

Other courts have similarly construed tied-house statutes in light of their purpose,[*] and I find the reasoning of these cases and the attorney general's opinion persuasive. I have no quarrel with Wisconsin's tied-house law and I believe it may properly ban "trade spending" practices that have, or threaten to have, an anti-competitive or controlling effect on the retailer.

But, as the trial court noted, "the issue . . . is not whether all forms of trade spending are permitted under sec. 125.33(1)(a), Stats., but [only] whether [Miller's] particular type of periodic trade spending is permitted . . .." Like the trial court, I would answer that question in the affirmative.

Miller's actions here exhibit none of the evils the statute was designed to prevent. There is nothing in the record to indicate that Miller's activities created or tended to create any financial or moral obligation that could lead, directly or indirectly, to controlled or monopolized retail establishments.

---

[*]*Hunter v. McKnight,* 86 So. 2d 434 (Fla. 1956); *Carling Brewing Co. v. Doyle Distributing Company,* 353 N.E.2d 222 (Ill. App. Ct. 1976); *Tom Boy, Inc. v. Quinn,* 431 S.W.2d 221 (Mo. 1968); *Burger Brewing Co. v. Thomas,* 329 N.E.2d 693 (Ohio 1975); *Dixie Distributors v. Lane,* 211 S.W.2d 581 (Tex. Civ. App. 1948).

To the contrary, Miller's spending has the obvious purpose of attempting to persuade customers to sample its beers and, as I am sure Miller hopes, to switch their beer-drinking preferences to its brands. And while the customers are obviously encouraged to sample Miller's beers, the offer is not withdrawn if a customer chooses another brewer's product—or even a soft drink. I note, too, that Miller pays the same price for the beverages purchased as do the customers. It thus seems to me, as it did to the trial court, that "[t]his limited form of trade spending [appears to be] no more than a reasonable marketing device used to increase sales."

It may be that, because of their frequency or dollar volume or other factors not present here, practices similar to those Miller used in this case might be considered as tending or threatening to subject the retailer to control, or imposing some "moral obligation," or otherwise raising the dangers the tied-house law was properly enacted to prevent. But that case is not this case. I see no attempt on Miller's part to coerce or control retailers, or to create any financial or moral obligations that might open the door to such control. I would affirm the judgment.